**David S. FORBES, et al.**

v.

**R. Alan EAGLESON, et al.**

**No. CIV.A. 95–7021.**

United States District Court,
E.D. Pennsylvania.

Aug. 27, 1998.

Alice W. Ballard, Samuel & Ballard, P.C., Philadelphia, PA, Martin Oberman, Chicago, IL, Edward Garvey, Garvey and Associates, Madison, WI, for Plaintiffs.

Jeremiah T. O'Sullivan, Sarah Chapin Columbia, Nicholas J. Nesgos, Shane K. Cobb, Choate, Hall & Stewart, Boston, MA, Scott E. Diamond, Manchel, Lundy & Lessin, Cherry Hill, NJ, for Defendant R. Alan Eagleson.

Michael A. Cardozo, Steven C. Krane, Thomas C. Moore, Proskauer, Rose, Goetz & Mendelsohn, New York City, Shepard Goldfein, Frank Rothman, Skadden, Arps, Slate, Meagher & Flom, New York City, Bennett G. Picker, Stradley Ronon Stevens & Young, LLP, Philadelphia, PA, for Defendant Nat. Hockey League.

Bennett G. Picker, Stradley Ronon Stevens & Young LLP, Philadelphia, PA, for Defendants Philadelphia Flyers Limited Partnership, Boston Professional Hockey Association, Inc., Niagara Frontier Hockey, L.P., Calgary Flames Limited Partnership, Chicago Blackhawk Hockey Team, Inc., Dallas Hockey Club, Inc., Detroit Red Wings, Inc., Edmonton Oilers Hockey Corp., Ktr Hockey Limited Partnership, Le Club De Hockey Canadien, Inc., Meadowlanders, Inc., New York Islanders Hockey Club, L.P., Rangers Hockey Club, A Division of Madison Square Garden Center, Inc., Pittsburgh Hockey Associates, Comsat Entertainment Group, Inc., a subsidiary of Comsat Corporation, St. Louis Blues Hockey Club, L.P., San Jose Sharks Corp., Maple Leaf Gardens, Limited, Vancouver Hockey Club, Ltd., Washington Hockey Limited Partnership, Jets Hockey Ventures, (A Limited Partnership).

## MEMORANDUM

O'NEILL, District Judge.

Plaintiffs David S. Forbes, Richard D. Middleton, D. Bradford Park, Ulf Nilsson, and Douglas D. Smail are former National Hockey League players. Alleging that their union, the NHL Players Association ("NHLPA"), was co-opted by the NHL and pilfered by their own union leader for nearly two decades, plaintiffs bring this suit as a putative class action on behalf of all players employed by NHL teams between 1972 and 1991 against R. Alan Eagleson, former executive director of the NHLPA; several businesses owned or controlled by Eagleson, Jial-

son Holdings, Ltd., Sports Management, Ltd., Rae–Con Consultants, Ltd., and Eagleson, Ungerman, a law firm (the "Canadian defendants"); and the NHL, its Member Clubs, and two NHL officials, John Ziegler, President of the NHL from 1977 to 1992, and William W. Wirtz, Chairman of the Board of Governors of the NHL (the "NHL defendants").

Plaintiffs' two-count fourth-amended complaint charges defendants with racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964. Count I alleges, in essence, that the NHL defendants and Eagleson maintained a collusive, quid pro quo arrangement in violation of federal antibribery labor law pursuant to which Eagleson forsook the players' interests in collective bargaining with the NHL. Count II alleges that Eagleson and the Canadian defendants engaged in a variety of schemes to pilfer union funds in violation of anti-embezzlement and mail fraud statutes.

The NHL defendants and Eagleson have moved to dismiss or for summary judgment as to Count I on grounds that plaintiffs' claims are barred by the statute of limitations.[1] Fed. R. Civ. Proc. 12(b)(6), 56. The parties have presented substantial material extraneous to the pleadings in the course of extensive briefing on the motion and have been notified that the motion will be treated as one for summary judgment.

### I.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c). In resolving the motion, I view the evidence and all reasonable inferences to be drawn therefrom in favor of plaintiffs as the non-moving

---

1. Eagleson and the Canadian defendants seek dismissal or summary judgment as to both Counts I and II of plaintiffs' complaint, but as grounds therefor rely only on the NHL defendants' arguments, which concern only Count I. Since the Canadian defendants have offered nei-

ther argument nor evidence in support of dismissing Count II, plaintiffs have not attempted to defend its timeliness. For this reason and because the two counts are not based on identical causes of action, only Count I will be addressed in this opinion.

parties. *See, e.g., Reitz v. County of Bucks,* 125 F.3d 139, 143 (3d Cir.1997).

Where the party moving for summary judgment bears the burden of proof, as defendants do with respect to their statute of limitations defense, the movant "must make an affirmative showing that it is entitled to summary judgment." *McGrath v. City of Philadelphia,* 864 F.Supp. 466, 473 (E.D.Pa. 1994); *see also National State Bank v. Federal Reserve Bank,* 979 F.2d 1579, 1581–82 (3d Cir.1992). The "applicability of the statute of limitations usually implicates factual questions as to when plaintiff discovered or should have discovered the elements of the cause of action; accordingly, 'defendants bear a heavy burden in seeking to establish as a matter of law that the challenged claims are barred.'" *Davis v. Grusemeyer,* 996 F.2d 617, 623 n. 10 (3d Cir.1993), quoting *Van Buskirk v. Carey Canadian Mines, Ltd.,* 760 F.2d 481, 498 (3d Cir.1985).[2]

## II.

■ Civil RICO claims are subject to a four-year statute of limitations. *Agency Holding Corp. v. Malley–Duff and Assoc., Inc.,* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). The question presented here is whether plaintiffs' claims accrued more than four years before they filed suit on November 7, 1995—that is, before November 7, 1991. If so, their claims are untimely unless the statute of limitations was tolled.

This is the second occasion on which I have been asked to determine whether plaintiffs' claims are barred by the statute of limitations. In denying defendants' previous motion, I relied upon the Third Circuit's unique "last predicate act" accrual rule for civil

RICO as set forth in *Keystone Ins. Co. v. Houghton,* 863 F.2d 1125 (3d Cir.1988). *See* 1996 WL 420829. That rule has since been invalidated by the Supreme Court's decision in *Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997), which plaintiffs concede applies retroactively to this case.

■ While the *Klehr* Court invalidated the Third Circuit's last predicate act exception, it did not establish which of the remaining rules followed by the various Court of Appeals should be applied. The parties, unsurprisingly, disagree on what rule should be adopted in *Klehr*'s wake. Defendants argue for the "pure injury" accrual rule used in Clayton Act antitrust cases, pursuant to which a claim accrues and the limitations period begins to run as soon as the plaintiff is injured. *See Klehr,* 117 S.Ct. at 1995 (Scalia, J. concurring) (advocating adoption of pure injury accrual rule). Plaintiffs argue that, aside from its "last predicate act exception," *Keystone* remains good law and compels application of a discovery accrual rule pursuant to which a plaintiff must have notice of all elements of a RICO claim before the limitations period starts to run.

*Keystone* established both a general discovery accrual rule and a "last predicate act" exception as follows:

[T]he limitations period for a civil RICO claim runs from the date the plaintiff knew or should have know that the elements of a civil RICO cause of action existed *unless,* as a part of the same pattern of racketeering activity, there is further injury to the plaintiff or further predicate acts occur, in which case the accrual period shall run from the time when the plaintiff knew or

---

2. Plaintiffs appear to contend that decision of the motion for summary judgment is premature at this stage of the litigation because they have not yet had an opportunity to conduct discovery of defendants. However, as to allegations concerning defendants' alleged conduct for which discovery might be pertinent—including their alleged fraudulent concealment—I will take plaintiffs' well-pleaded allegations as true and draw all reasonable inferences from them in plaintiffs' favor. Thus, the only potential factual issues relevant to decision of this motion concern plaintiffs' knowledge of their claims in light of media reports and other matters of public record, and

as to such issues I cannot conceive how discovery of information not already available to plaintiffs could be relevant.

The crux of plaintiffs' argument throughout the lengthy briefing on this motion has been that the information available to hockey players prior to the limitations period was insufficient to give them notice that Eagleson and the NHL defendants had engaged in a pattern of illegal management-labor bribery. (*See, e.g.,* Pls. B. at 6; Pls. Surreply B. at 2.) Whether a reasonable jury could agree with this claim is a question which this Court may and will decide on motion for summary judgment.

should have known of the last injury or the last predicate act which is part of the same pattern of racketeering activity. The last predicate act need not have resulted in injury to the plaintiff but must be part of the same 'pattern.'

*Keystone,* 863 F.2d at 1130 (emphasis added). The effect of the exception allowed plaintiffs to use any predicate act within the statute of limitations period to recover for any and all past injuries caused by a RICO conspiracy, no matter how much time had passed or what plaintiffs had known or should have known of their claims. It was rejected by the Supreme Court because, among other things, it potentially resulted in dramatically lengthened limitations periods and allowed plaintiffs to sleep on their claims while treble damages accumulated, contrary to civil RICO's purpose of encouraging private persons to investigate possible racketeering activity. *Klehr,* 117 S.Ct. at 1989–90.

The Court did not, however, purport to disturb *Keystone* 's general rule (also known as the "injury plus source plus pattern" discovery rule) that the statute of limitations period for a civil RICO claim "runs from the date the plaintiff knew or should have know that the elements of a civil RICO cause of action existed." *See Klehr,* 117 S.Ct. at 1989, 1992. To the contrary, the Court expressly reserved judgment on whether a "discovery" accrual rule was appropriate for civil RICO cases, and if so, just what must be discovered for a claim to accrue. *Klehr,* 117 S.Ct. at 1992. *Klehr* does not, therefore, compel reexamination of the Third Circuit's general discovery rule.

Nor do I see any other reason to call into question the continued viability of the "injury plus source plus pattern" discovery rule. The *Keystone* Court adopted that rule, which is also followed by the Eighth Circuit and similar to the "injury plus pattern" rules followed in the Tenth and Eleventh Circuits, *see Klehr,* 117 S.Ct. at 1988–89, 1992, only after carefully reviewing and rejecting other accrual rules, such as that advocated by de-

fendants, which look only to when an injury occurred or was discovered. The Court found these other rules inappropriate to the RICO context because they fail to take into account the central "pattern of racketeering activity" element of a RICO violation:

The Supreme Court ... has made it clear that "the heart of any RICO complaint is the allegation of a pattern of racketeering." *Malley–Duff,* 107 S.Ct. at 2766 ... In *Sedima [v. Imrex Co.,]* the Supreme Court clarified the fact that "the essence of the violation is the commission of those [predicate] acts in connection with the conduct of an enterprise." 473 U.S. [479] at 497, 105 S.Ct. [3275] at 3285, 87 L.Ed.2d 346 (1985). Given the Supreme Court's emphasis on the pattern element as the core of the violation, the simple discovery rule's focus on injury is misplaced.

863 F.2d at 1133 (alteration in original); *see also Klehr,* 117 S.Ct. at 1990 (noting in dicta that the injury accrual rule of the Clayton Act might not necessarily be appropriate for RICO cases because "civil RICO requires not just a single act, but rather a 'pattern' of acts"). I therefore conclude that it remains the law of this Circuit that a civil RICO claim accrues when the plaintiff "knew or should have known that the elements of a civil RICO cause of action existed." *Accord Perlberger v. Perlberger,* 1998 WL 76310, *5 (E.D.Pa. 1998).

■■■ The elements of a RICO cause of action are the (1) conducting of (2) an enterprise (3) through a pattern of (4) racketeering activity (5) causing plaintiffs injury in their property or business. *Alberici v. United States Dept. of Justice,* 1992 WL 57922, *3 (E.D.Pa.); *see also Keystone,* 863 F.2d at 1128; 18 U.S.C. §§ 1962, 1964.[3] Thus, plaintiffs' claims accrued and the statute of limitations began to run when they discovered or should have discovered that defendants had possibly engaged in conduct constituting the alleged pattern of racketeering and that this conduct had possibly caused them injury.[4]

---

**3.** A "pattern" of racketeering activity "requires at least two acts of racketeering activity" committed within ten years of each other. 18 U.S.C. § 1961(5).

**4.** The qualification "possibly" is important. "If a plaintiff were entitled to have all the time he needed to be certain his rights had been violated, the statute of limitations would never run—for even after judgment, there is no certainty."

"Awareness that each element comprising a RICO claim is present is crucial while cognizance of the legal implication of these facts, that is, that there is a civil RICO cause of action, is irrelevant." *Keystone*, 863 F.2d at 1128.

 Plaintiffs contend they did not and could not learn sufficient facts to bring this action until 1994 due to defendants' fraudulent concealment. Fraudulent concealment is an equitable tolling doctrine read into every federal statute of limitations.[5] *Davis v. Grusemeyer*, 996 F.2d 617, 624 (3d Cir.1993). Fraudulent concealment will toll the running of the limitations period "only if it misleads a plaintiff into thinking that he does not have a cause of action. 'The doctrine ... does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a potential claim.' " *Id.* at 624 (quoting *Hobson v. Wilson*, 737 F.2d 1, 35 (D.C.Cir.1984).) To successfully invoke the doctrine, plaintiffs must therefore show not only that they remained ignorant of their cause of action into the limitations period, but that their ignorance was not due to their own lack of reasonable diligence. *Klehr*, 117 S.Ct. at 1993; *Davis*, 996 F.2d at 625. Since "the means of knowledge are the same thing in effect as knowledge itself," *Wood v. Carpenter*, 101 U.S. (11 Otto) 135, 25 L.Ed. 807 (1879), plaintiffs will be charged with notice of their claim if they had both inquiry notice and means reasonably at hand to discover facts necessary to assert their claim.

 Insofar as plaintiffs contend that defendants concealed facts essential to their cause of action. I think it clear that the doctrine of fraudulent concealment adds nothing to analysis of the timeliness of plaintiffs' claim not already implicit in the RICO discovery rule. Like the discovery rule, fraudulent concealment will delay the running of the statute of limitations until plaintiffs discovered, or in the exercise of reasonable diligence should have discovered, all the elements essential to their RICO claim. *See,*

*Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir.1990).

*e.g. Hodges v. National Basketball Assoc.*, 1998 WL 26183 at *3 (N.D.Ill.1998) (doctrine of fraudulent concealment tolls the statute of limitations when defendants have successfully concealed "vital information bearing on the existence of [a] claim"). To the extent that a defendant's concealing efforts succeed, "they postpone the date of accrual by preventing the plaintiff from discovering that he is a victim of a fraud ... They are thus within the domain of the discovery rule." *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450–51 (7th Cir.1990); *see also Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 90 L.Ed. 743 (1946) ("where a plaintiff has been injured by fraud and 'remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party' ") (quoting *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 348, 22 L.Ed. 636 (1874)).

However, plaintiffs might also be understood as invoking "fraudulent concealment" in another sense—one which "presupposes that the plaintiff had discovered, or, as required by the discovery rule, should have discovered, that the defendant injured him, and denotes efforts by the defendant—above and beyond the wrongdoing upon which the plaintiff's claim is founded—to prevent the plaintiff from suing in time." *Cada*, 920 F.2d at 451. For example, an age-discrimination plaintiff presented with forged documents seeming to negate any reason he might have had to think his firing was related to his age would have a good case for tolling the statute of limitations. *Id.*

 In this second sense, then, fraudulent concealment refers to a defendant's affirmative (and successful) efforts to mislead the plaintiff as to the nature or significance of facts which would have shown the existence of a claim. However, as with the discovery rule and equitable tolling, a plaintiff who is not reasonably diligent in attempting

---

5. "Fraudulent concealment" has been invoked with respect to a variety of tolling doctrines. *See generally Cada*, 920 F.2d at 450–51.

to discover his or her claims will not enjoy the tolling of the limitations period simply because the defendant engaged in fraudulent concealment. *Klehr*, 117 S.Ct. at 1993.[6]

With these principles in mind, I turn to plaintiffs' allegations and the evidence defendants contend shows that plaintiffs had or should have had notice of their claim prior to November 7, 1991.

### A.

Defendant R. Alan Eagleson was executive director of the NHLPA, the exclusive bargaining unit of NHL players, from the union's inception in 1967 until the end of 1991. Essentially singlehandedly, he operated the union's daily business and conducted the players' collective bargaining negotiations with the NHL. He also engaged in business for himself as an agent and lawyer representing players and even management personnel in their individual contract negotiations with club owners.

Plaintiffs allege that from 1976 through 1991 the NHL defendants gave Eagleson unsupervised control of a joint NHL–NHLPA venture which participated in international hockey tournaments. They also granted permission for NHL players to participate in the extra-NHL events, which would otherwise have been prohibited by the players' contracts. The participation of the best NHL players was essential to the success of the tournaments. (Comp.¶ 28.)

As head of the joint venture and as chief negotiator for the International Committee of Hockey Canada, a non-profit organization which negotiated international hockey events for Canada, Eagleson organized some two dozen or more tournaments from 1976 to 1991, including five Canada Cups and nearly annual World Championships and Soviet Union team exhibition tours. For each Canada Cup, Hockey Canada was to be paid the first $600,000 of net tournament proceeds after expenses and 15% of net revenues above $2 million. All other net revenues were to be split equally between the NHL clubs and the NHLPA.[7] The NHL players earned little additional pay for playing in the tournaments and were induced to participate on the understanding that they would be benefiting their pension fund. In fact, plaintiffs allege, with Eagleson's assent the NHL defendants simply reduced their contributions to the pension fund by however much the players contributed through international hockey.

Eagleson allegedly used his control over international hockey to enrich himself and his associates. He (1) directed revenue from sales of television and rinkboard advertising rights to himself and associates; (2) appropriated air travel passes obtained from Air Canada in exchange for advertising rights for his personal use and that of family and associates; (3) charged excessive rents for office space; and (4) obtained excessive reimbursement for the legal services of his law firm and for the services and expenses of employees of other of his private businesses who were "lent" to the international hockey venture to coordinate the tournaments. Many of these schemes reduced the net proceeds to be divided between the NHLPA and the NHL pursuant to their joint venture. (Comp.¶¶ 36–42).[8]

In addition, from 1977 to 1986 the NHL defendants gave Eagleson the power to place the NHL's disability insurance policies for

---

**6.** Plaintiffs are thus incorrect in asserting that because defendants engaged in fraudulent concealment they had to have "actual knowledge" of their claim before the statute of limitations could begin to run. While defendants' conduct may, of course, be among the circumstances against which the reasonableness of a plaintiff's diligence is judged, *see e.g., Salois v. Dime Savings Bank*, 128 F.3d 20, 26 (1st Cir.1997), RICO plaintiffs must exercise reasonable diligence under the circumstances regardless of defendants' concealment. *Klehr*, 117 S.Ct. at 1993; *Davis*, 996 F.2d at 625. Accordingly, constructive notice is always sufficient to start the statute of limitations running.

**7.** The NHL–NHLPA venture concerned both the Canada Cups and other international hockey events (Comp.¶ 32), but the Canada Cups were evidently the most financially significant and are the focus of plaintiffs' allegations.

**8.** Count II defendants Jialson Holdings, Sports Management, Rae–Con Consultants, Ltd., and Eagleson, Ungerman were allegedly party to Eagleson's schemes to pilfer international tourney revenues as well as other union funds.

the players. (He also controlled the NHLPA's insurance funds.) Eagleson allegedly used his control over the disability insurance funds to extort personal benefits from insurance brokers and sham legal fees from players seeking disability benefits. (¶ 43.)

The crux of plaintiffs' claim against the NHL defendants is that they knew that Eagleson was using his control of international hockey and NHL disability insurance funds to enrich himself, but nonetheless allowed him to continue to exercise these powers unconstrained. (Comp.¶¶ 44, 47, 49–50, 64.) This acquiescence, plaintiffs allege, amounted to a pattern of violations of § 302 of the Labor–Management Relations Act (LMRA), 29 U.S.C. § 186. Violations of § 302 constitute predicate acts of racketeering under 18 U.S.C. § 1961(1)(C) (defining as a "racketeering activity" any act indictable under 29 U.S.C. § 186). (Comp.¶¶ 46, 63.)

Section 302 prohibits employers, employer associations, and their agents from paying money or any other "thing of value" to employee representatives, and prohibits employee representatives from accepting any such payment.[9] 29 U.S.C. § 186(a), (b). Plaintiffs allege that the NHL defendants violated § 302(a) each time they permitted NHL players to participate in an international tournament, gave Eagleson unsupervised control over a tournament and its revenues, failed to hold Eagleson accountable for the revenues and/or overlooked his financial improprieties, and allowed him control over placement of the NHL's disability insurance premiums. Concomitantly, Eagleson allegedly violated § 302(b) every time he accepted

control of an international tournament or the purchase of disability insurance. (Comp. ¶¶ 47–49.)[10]

In return for the NHL defendants' facilitation of and acquiescence in his self-enriching schemes, Eagleson allegedly betrayed the interests of the players in collective bargaining. Without attempting to gain concessions in return or marshal the players' collective leverage, he agreed to the 1979 merger of the NHL and World Hockey Association (WHA), lack of free agency, supplemental drafts, equalization rules, and non-disclosure of players' salaries; he acquiesced in the removal of player representatives from the board of the players' pension funds and in the owners' practice of offsetting pension contributions by the amount the players contributed via international hockey; and he agreed to inadequate minimum salaries. As a result, the players' compensation was substantially suppressed from what it would have been had they been represented by an un-compromised and aggressive union negotiator. (Comp.¶¶ 51–52.)

Eagleson negotiated collective bargains between the NHL and the NHLPA signed in 1976, 1981, 1984, and 1988. The last Eagleson-negotiated collective bargain expired in September 1991 and Eagleson's employment with the NHLPA terminated in December 1991.

### B.

As evidence that plaintiffs had or should have had knowledge of their cause of action by September 1991, at the latest, defendants point to a 1984 *Sports Illustrated* expose of Eagleson; a 1989 report on Eagleson's stew-

---

9. Section 302 provides:

> (a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—
> (1) to any representative of any of his employees who are employed in an industry affecting commerce; or
> (2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are

> employed in an industry affecting commerce:....
> (b)(1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section....

10. Count I also alleges that Eagleson committed predicate acts of mail fraud and obstruction of justice in violation of 18 U.S.C. §§ 1341, 1346, and 1512(b) in attempting to conceal his wrongdoing. *See* 18 U.S.C. § 1961(1). In addition, plaintiffs contend that Eagleson's predicate acts can be imputed to the NHL defendants and vice versa because they were co-conspirators.

ardship of the union (the "Garvey report") issued by investigators acting at the behest of a large number of hockey players; a complaint filed on behalf of two players with the Alberta Labor Relations Board in June 1991 seeking to void the players' collective bargaining agreement on grounds of collusion between the union and the NHL; and a series of investigative articles on the NHL and the union published in September 1991 by *The Eagle–Tribune* of Lawrence, Massachusetts.

Plaintiffs. on the other hand, contend that they did not and could not obtain sufficient, verifiable information to know and plead their claims until a federal grand jury indictment was issued in 1994 charging Eagleson with 32 counts of racketeering, embezzlement from a labor union, receipt of kickbacks affecting an employee welfare benefit plan, mail fraud, and obstruction of justice.

### 1.

The *Sports Illustrated* article, published in July 1984 and entitled "The Man Who Rules Hockey," began with these assertions, among others:

> From an unshakable power base rooted in 17 years of near-dictatorial rule as executive director of the NHL Players' Association, and fueled by what one associate calls "an ego the size of Guatemala," Eagleson, 51, has spread his personal and corporate influence from his Toronto offices into virtually every aspect of hockey in which there's a dollar to be made. Because he holds the ultimate bargaining chip—100% of the world's best professional hockey players—scarcely anything of import can happen in the sport without the approval, if not the direct participation, of Eagleson. However, there's evidence that Eagleson has at times abused his multiple powers as head of the NHLPA, chief negotiator for Hockey Canada (the nonprofit corporation that administers Canada's participation in major international events) and personal representative of many of the NHL's stars specifically for his personal gain and the gain of his friends.
>
> .... Eagleson rules hockey from atop a sort of international pyramid, because he's likely to be negotiating today against the side he'll be representing at a different bargaining table tomorrow. Ultimately, Eagleson's or his clients' interests are represented on virtually every side of every deal in hockey.
>
> .... As executive director of the NHLPA, Eagleson speaks for all 480 of the league's players on all manner of issues: their insurance coverage, pension plan, licensing contracts, individual grievances against clubs and, most important, collective bargaining agreement with the NHL. When a new NHLPA–NHL contract is worked out—with never more than a lovers' quarrel cropping up, quite unlike recent negotiations in pro football, baseball and basketball—Eagleson immediately becomes an agent for the partnership of players and owners in international hockey and joins forces with Hockey Canada to arrange such competitions as the six-nation Canada Cup tournament, which grossed $6 million in 1981 and will be staged again this September.

(Daly Aff., Ex. B. at 62.)

The article reported "a number of instances in which Eagleson appears to have used his position for his own or his friends' personal gain." (*Id.* at 66.) In addition to evidence of a pattern of self-dealing in his representation and financial counseling of individual player-clients, the article reported that Eagleson apparently enriched himself in administering international hockey and players' disability insurance funds.

The article quoted at length a sports insurance broker to the effect that Eagleson extorted personal benefits, such as insurance policies for himself and his family and sham fees for his law firm, in exchange for placing disability insurance with the broker. Another broker suggested he was subject to similar demands. Two former players, Bob Dailey and Glen Sharpley, claimed Eagleson had demanded improper fees from them to collect on their union and NHL disability insurance policies. Both were apparently charged for the expenses of an insurance executive who flew to the U.S. from London to discuss their insurance matters, yet the executive. Ber-

nard Warren, maintained that his firm had paid for his expenses. (*Id.* at 66–69)

As to international hockey, the article alluded to a possible collusive link between Eagleson's control of the tournaments and his representation of the players in bargaining with the NHL as follows:

[U]nlike their football, baseball and basketball counterparts, hockey players have never seriously threatened to strike. They've never held out for full free agency. And though their average salary has risen from $60,000 to $130,000 in the last decade, the increase over that period is markedly less than those in baseball (up more than $250,000) and basketball (up $160,000). Even the NFL average has risen nearly $100,000.

"A joke" on the players is what Toronto Maple Leafs president and managing director Harold Ballard called the 1982 collective bargaining agreement between the NHL and the NHLPA. Gus Badali, a Toronto-based agent whose clients include Wayne Gretzky and some 30 other NHL players, says "a couple" of NHL general managers have told him point-black that the current collective bargaining agreement is the best ever—for management. "They certainly don't hide their glee," says Badali. Certainly Ballard doesn't. "How do the owners feel about Eagleson?" he says. "We like him.... Sure, it's a great contract—for us." Yet Chicago Black Hawks president William Wirtz says he believes the contract was a good one for the players, as well as the owners. Wirtz adds. "I think Alan is a brilliant negotiator."

Eagleson is peevish when asked to explain why NHLPA contacts seem to fall short of those in other sports, particularly in the area of free agency, which, in hockey, essentially does not exist. He insists that hockey's collective bargaining agreements measure up. He also points to the precarious financial conditions of several NHL teams and the lack of a major U.S. television contract to justify what might appear as soft-pedaling at the bargaining table. "My job is to preserve jobs for as many

players as I can at as high a level of salary as I can," says Eagleson.

But to one general manager, Eagleson's reluctance to play hardball is strictly a matter of quid pro quo. 'Al delivers us the players,' he says, 'and we give him international hockey. It's that simple.' And international hockey is the cash cow of the sport.....

"It was truly patriotism that got Eagleson in [to organizing international hockey events]," says Doug Fisher, a Hockey Canada board member at the time. "That plus cupidity, position, influence. Alan wanted to run the show like a political machine. It was only when the numbers started coming in that he began to see the dollar signs."

(*Id.* at 64–66, alteration added.)

The article disclosed that business entities nominally under the control of a close Eagleson associate. Arthur Harnett, had bought or brokered television and advertising rights to Canada Cups and other international tournaments since 1972; public records showed that in 1976 one of these businesses had earned over $1 million in commissions brokering serial sales of Canada Cup television advertising rights. Advertising rights had been sold outright to a Harnett company for the 1981 Canada Cup. Three persons who had done business with Harnett and Eagleson claimed that Harnett, whose businesses were incorporated by Eagleson, was actually under Eagleson's complete control. (Eagleson insisted that his relationship with Harnett was "limited to that of 'solicitor [lawyer] and adviser and friend.'") (*Id.* at 71, alteration in original.)

The article also disclosed examples of how Eagleson, as he himself admitted, "lent" employees of his private agency businesses to Hockey Canada for international tourney duties at rates far exceeding the salaries he paid them, thus allowing him to subsidize their work for his private companies with international hockey funds, and hinted that he might be accomplishing the same trick with regard to his private businesses' office expenses. (*Id.* at 71–72.) [11]

11. "For example, until the time he left Eagleson in 1980 ... [Sports Management employee

2.

Beginning in late 1988, plaintiffs allege, agents of some hockey players began seeking information about the finances of international hockey tournaments.[12] In November 1988, they "issued a 'Position Paper' to the public in which, *inter alia*, they questioned Eagleson's conflicts as union leader and player agent as well as his role in international hockey," contended that it was his fiduciary duty to disclose information on the tournaments' finances, and asserted that "[a]udited information should have been prepared regarding all monies received by Mr. Eagleson directly, or indirectly, in relation to his efforts in organizing the international hockey events." (Comp.¶¶ 79–80.) About the same time, Ed Garvey, one of plaintiffs' counsel in this action, began an investigation of Eagleson and the union's affairs at the request of a "substantial number of members of the plaintiff class." (Comp.¶ 82.) Garvey and other investigators unsuccessfully sought financial information about international hockey and the union from Eagleson, the union, the NHL, Hockey Canada, and the Canadian government. (Comp.¶¶ 79, 82, 84, 86.)

Nonetheless, in June 1989 Garvey released a "Confidential Report to NHLPA Members" purporting to reflect information gathered by him and player agents Rich Winter and Ron Salcer "on 17 team visits, countless phone calls to players, and years of experience as a Players Association executive and over 15 years of experience as player agents in hockey," as well as information provided by other player agents and Canadian attorneys. (Daly Aff., Ex. A. at 1.) The report also cited the 1984 *Sports Illustrated* article several times and recommended that all players read it.[13] Garvey leveled numerous charges against Eagleson for apparent self-dealing and deficient representation of the players. His report detailed inadequacies in the collective bargaining agreements, cited numerous instances in which Eagleson had made concessions for no apparent gains in return and without attempting to marshal the players' leverage, and lambasted Eagleson for achieving so little over the years compared with what had been achieved by players'

Bill] Watters was doing, by his own estimate, 85% of all contract negotiations for Eagleson's hockey clients. For that, Eagleson paid Watters an annual salary of around $45.000. In '77 and '78. Watters was also paid a total of $107,500 by Hockey Canada for additional duties such as coordinating the '77 World Junior Tournament and acting as general manage for Team Canada in the '77 and '78 world championships. As far as Eagleson was concerned, the money Watters got from Hockey Canada meant that he 'was paid for two years.' Therefore, Watters received no salary directly from Eagleson for '77 and '78, but he did get the $107,500 from Hockey Canada.

"Eagleson had similar arrangements with other employees he lent to Hockey Canada, including Goldblatt and Curran, collecting on their services much the same way he collected for telephones, office machines and secretarial services he lent Hockey Canada. In 1976, for instance, he submitted to Hockey Canada an expense statement for $83,281 labeled 'office and general' expenses."
*Id.*

12. Plaintiffs do not disclose which players these agents represented or whether it was the *Sports Illustrated* charges or other information that gave rise to their concern.

13. A section of the report entitled "The Conflicts of Interest" stated:

Four years ago, *Sports Illustrated* wrote a tough article about Alan Eagleson. Alan told me that he threatened them with a libel action and spent considerable money fighting SI. He suggested he would do the same to me. From the other side, apparently SI dropped a number of items that would have been published had Alan not threatened legal action.

Whatever the facts may be, it was a story that raised so many serious questions about the activities of Alan that you should read it again. We have enclosed a copy. When *Newsday* reporter Jim Smith interviewed Alan, he said that Eagleson had his attorney present and that he taped the entire conversation.

One theme is constant. Alan Eagleson has serious conflicts of interest. To his credit, he does not hide many of the conflicts although he rarely discusses how the conflicts might interfere with his position as executive director of the Association.... He dismisses the conflicts by saying, "if you tell people about the conflicts, there is no problem". Apparently, he believes that disclosure is all that is required. I know of very few people who agree with that statement, but we should ask whether he has, in fact "disclosed" all his conflicts and "explained" the impact of those conflicts on you and future members of the NHLPA.
*Id.* at 44.

unions in other sports and what union officials had expressed as their bargaining goals. Dwelling at length on the contrast between Eagleson's apparent unpreparedness, ineffectiveness, and lack of ambition at the collective bargaining table and his demonstrated ability to be a well-prepared, ambitious, and successful bargainer when it came to his own contract with the union, the clear thrust of the report was that Eagleson's inadequacies at the bargaining table were not merely a matter of incompetence. (*See especially id.* at 9–17, 23–33, 40–42.)

Among the conflicts of interest with which the report took issue was Eagleson's simultaneous control over international hockey and collective bargaining negotiations with the NHL:

> *International Hockey vs. NHLPA Interests:* A general manager was quoted by SI as follows: 'Al delivers us the players and we give him international hockey. It's that simple.' Harold Ballard called the 1982 collective bargaining agreement 'a joke on the players.' Alan wants to head international hockey. He *can only do so if the NHL owners and Ziegler agree.* Therefore, he must not do things at the bargaining table to antagonize them too much or they will dump him—simple as that. Again, Trottier's agent commented on Alan's conflict: 'They can take international hockey away from Alan so they have him where they want him and that isn't right.'

(*Id.* at 51, emphases in original.)

The report also strongly criticized Eagleson for failing to provide information to the players. It asserted that players had "virtually no ability to get detailed information about the operations of their union, their pension, International Hockey, decision making in the NHL, salaries, the economics of the NHL or any other important matter impacting on their careers," and that Eagleson had refused to provide "information that is required by law to be made available to all union members." (*Id.* at 2.) [14]

In response to the Garvey report and other public criticism of his leadership,[15] Eagleson sent several memos and newsletters to all players asserting that he had never received benefits from international hockey, direct or indirect; that Hockey Canada's tournament records were audited and approved by independent accountants; and that financial statements were available. (Comp. ¶ 81, 83, 95, 98–99.) At the same meeting of player representatives on June 3, 1989 at which Garvey presented his report, Eagleson saved himself from being fired by promising he would relinquish control of international hockey, find a successor to whom he would shortly turn over control of the union, and release financial records and his own tax returns. By manipulating a subsequent player representatives meeting he was able to hold onto his job (through the end of 1991) and international hockey, and never did release the promised financial information. In fact, he steadfastly refused to release any financial documentation or audit reports to the player representatives, Garvey or others, such as plaintiff Forbes, who sought to obtain

---

14. With respect to information on international hockey, Garvey reported that Eagleson was paid a $25,000 bonus under his contract with the union for each international Soviet tour or Canada Cup from which the union gained $600,000 or more, and stated:

> The $25,000 Alan received from the NHLPA for international hockey may be the tip of the iceberg. We have asked Hockey Canada to tell us how much money goes to Alan, his law firm, holding companies he controls, family members or other legal entities. The result of our investigation is a big goose egg. The Hockey Canada spokesman ... told me: 'We cannot tell you how much money went to Eagleson *without Alan's permission,* but he has the information if he wants to share it with

you. Otherwise, we must await permission from the Hockey Canada Board to give you an accounting....'
And the man with the information, Alan Eagleson, won't give us an answer. While he has always maintained that he 'doesn't take a dime from international hockey', former employees dispute that and now he admits that Hockey Canada pays some 'overhead'. How much overhead? He won't say. Does he get money from promoting Intl. Hockey; from rink-board advertising as one player assured us he does?
*Id.* at 14–15 (emphasis in original).

15. The imbroglio in 1989 between Eagleson and Garvey, Winter, and Salcer apparently received significant media coverage in Canada and the U.S. *See, e.g.,* Pls. Ex. 39–40, 44.

them. (Comp. ¶¶ 90–93, 100; Pls. B. at 40–41)

Plaintiff Forbes nonetheless continued to seek information on both international hockey and the players' pension fund throughout 1990 and early 1991. In response to his efforts and others', Eagleson sent letters and memoranda to the player representatives and to all retired players denying the allegations *Sports Illustrated,* Garvey, and Rich Winter had leveled at him and representing that audits had cleared him of any improprieties. (Comp. ¶¶ 102–03; *see also* Forbes Aff. ¶ 5, Ex. A.) In addition to these misrepresentations and continued refusals to disclose financial information, plaintiffs allege, "Eagleson and representatives of the Member Clubs repeatedly misled members of the class [of hockey players] by asserting that allegations that players had received less than adequate benefits over the years were not true," while Eagleson "made numerous other statements to the players, purporting to document why concerns raised by Garvey and others were not accurate or well founded." (Comp. ¶¶ 118–20.) In May 1991, Forbes ceased his seemingly futile quest for financial documentation.

### 3.

In June 1991, Rich Winter, a contributor to the Garvey report, filed a complaint with the Alberta Labor Board on behalf of two Edmonton Oilers seeking to void the NHLPA–NHL collective bargaining agreement. The complaint alleged that the union was dominated by the NHL as the result of an arrangement between Eagleson and the NHL and certain Member Clubs and officials and leveled a host of charges of collusion between Eagleson and the NHL, centered in large part on the NHL's acquiescence in Eagleson's use of international hockey to enrich himself and his family and associates. (Cardozo Aff., Ex. A at ¶¶ 36–43, 44(n), 46, 47(h), (*l*).) In support of its claims the complaint cited only the 1984 *Sports Illustrated* story.[16]

### 4.

The Tikkanen–Muni labor complaint, as well as the Garvey report and *Sports Illustrated* article, were among the subjects of a series of articles published September 22–26, 1991 by *The Eagle–Tribune* of Lawrence, Massachusetts. (Cardozo Aff., Ex. C at 2–3.) The five-part series reported the results of what was described as a nearly year-long investigation into the affairs of the NHL and NHLPA involving interviews with over 200 people, including 100 former or current players, and review of some financial records. (*Id.* at 1.)

The first article of the series was headlined "Big-time hockey: A study in conflicts of interest; Did union chief Alan Eagleson help

---

**16.** The complaint said this of the *Sports Illustrated* article:

[¶ 15] The article described numerous examples of the close association of R. Alan Eagleson ... with the NHL, its member clubs, and owners, officers, and employees of the NHL's member clubs including, but not limited to, the following:

a. Eagleson acting as agent for the partnership between the NHL and the NHLPA in international hockey;

b. The arrangement between the NHL and Eagleson pursuant to which Eagleson delivers the players to the NHL under the terms of a Collective Agreement more advantageous to the NHL than it would have been had Eagleson negotiated for the NHLPA in good faith in exchange for which the NHL granted Eagleson the permission he needs to run international hockey;

c. Eagleson representing a number of NHL coaches and general managers;

d. Eagleson's close personal relationship with NHL President, John Ziegler, and Chicago Black Hawks' owner, William Wirtz;

e. Eagleson's impassioned plea for the NHLPA to permit the NHL to merge with the World Hockey Association in 1979 without advising the NHLPA of the concessions the NHL was prepared to make to gain the NHLPA's agreement to the merger resulting in a deal more advantageous to the owners than it would have been had Eagleson acted in good faith and not misrepresented the NHL's financial condition to the NHLPA; and

f. Eagleson acting on behalf of a partnership that included deceased Toronto Maple Leaf owner, Harold Ballard.

16. The NHL was aware a large number of NHLPA members read the above mentioned article.

17. The NHL did not communicate with NHLPA members or call upon Mr. Eagleson to place any evidence before the NHLPA or its members contradicting any of the allegations referred to in the *Sports Illustrated* article leaving with NHLPA members the impression the business relationships between Eagleson and the NHL were intimate and commingled....

the players or himself?" and "Players say conflicts are why salaries lag." It began:

> Pro hockey's 75th anniversary season is about to begin. . . . . But there is trouble. The season is beginning with feelings of bitterness and anger, amid lawsuits and threats of lawsuits, fueled by charges of wrongdoing by some of hockey's biggest names against its top leaders. There is talk of the league's first strike in more than 60 years over the long simmering issue of free agency.
>
> Behind the upheaval in the NHL, *The Eagle–Tribune* has found, are charges by players that they have been betrayed not only by the league but also by their own union's executive director, R. Alan Eagleson. . . .

(*Id.* at 1–2.)

Among the series' "major findings," the initial article summarized the following:

> ● The head of the players' union, Eagleson, has repeatedly placed himself in a position of conflict of interest between players and team owners, and between union and personal business. Some players and other agents charge the players have wound up the losers. Meanwhile, they contend, Eagleson has won the favor of the league and team owners and advanced his own career, becoming perhaps the most powerful man in hockey.
>
> ● While representing more than 2,500 players since 1967 on teams in the United States and Canada, the players' union is not fully accountable to labor authorities in either nation. . . . .
>
> ●Eagleson became Canada's international hockey czar by obtaining the blessing of NHL owners, with whom he has bargained on behalf of the players. Eagleson also has close ties with NHL executives and some individual owners, but maintains he has been able to remain a tough negotiator for the players. . . .
>
> ●Hockey players, who face the most restrictive free agent rules in North American professional sports, may have lost a major chance to win free agency when they consented to a 1979 merger between the NHL and the rival World Hockey Association (WHA). As a result, according to one study, hockey salaries have slumped in relation to salaries in the three other major sports. . . . [17]
>
> ●Players who suffer major injuries often are denied disability insurance benefits and must fight to get a settlement. In one case, a player who suffered permanent brain damage after being slammed into the boards was denied full benefits because of a policy change that he was unaware of.
>
> ●The British broker who handled the disability insurance also co-owns a lease on an exclusive London flat with a firm headed by Eagleson. At least once, Eagleson billed players for staying in the apartment. . . . .
>
> ●For patriotism and the pension fund, all-star hockey players take minimum pay to play for their national teams in the Canada Cup tournament and other international matches. But financial records show that because of expenses the Players Association gets less than 10 percent of the income. The records have been available to the NHL but unavailable to the Players Association, even though the two are supposed to be partners in Canada Cup tournaments. . . . [18]

(*Id.* at 1–3.)

As to the conflict of interest presented by Eagleson's control of international hockey, one article stated:

> ●Union funds were loaned to clients of Eagleson under what some experts say were favorable terms for the borrowers.
> ●As head of the union, Eagleson moved its headquarters to a building purchased shortly before the move by an Eagleson family trust. While he has said the move saved money, financial records indicate otherwise.
> ●Hockey club owners were able to use millions of dollars in surplus money to offset their mandated contributions to the player pension fund.

---

17. A separate article detailed how the WHA–NHL merger appeared to have been a "done deal" worked out by Eagleson and the NHL behind the scenes, after which Eagleson manipulated the players into approving the deal without obtaining significant concessions in return. *Id.* at 6–7.

18. Other "major findings" of the series pertinent to plaintiffs' claims are these (*id.* at 1–3):

Eagleson's biggest conflict, according to critics, stems from his maintaining personal and professional ties to NHL bosses while also representing players as their union's executive director.....

Eagleson is also linked to NHL owners and executives through international hockey.... Eagleson needed NHL approval to use NHL players in that [first Canada Cup] match and all that he has organized since then. Critics say that makes Eagleson beholden to the same people he has bargained with on behalf of players.

One unnamed hockey general manager was quoted as saying in the 1984 *Sports Illustrated* article: "Al delivers us the players and we give him international hockey."

"You and Ziegler have become co-commissioners or co-presidents of international hockey as well as the NHL," Ed Garvey, a U.S. labor lawyer retained by a group of players wrote to Eagleson in 1989. "You have moved into a conflict position that is so deep it would be nearly impossible to untangle you, your relationship with Ziegler and Wirtz, your involvement with International Hockey and your supposed role as leader of the union."

(*Id.* at 10, some indentations omitted.)

Much as *Sports Illustrated* had seven years before, the article went on to report how, despite his disclaimers to the contrary, Eagleson and his associates profited from the tournaments. Eagleson rented out his private employees for international tournament work at rates exceeding what he paid them, essentially allowing him to subsidize his own employees with international tourney funds and sometimes even make a premium on top.[19] In addition, Hockey Canada records showed that companies of Eagleson associate Arthur Harnett had brokered tournament advertising rights for the 1972, 1976, and 1981 Canada Cups, making hundreds of thou-

That happened after the Players' Association agreed to the removal of player representatives from the pension board and the board changed the rules. The move was negotiated by Eagleson on behalf of the players. Hall of Fame players have gone to court over the pension issue. The owners, who say the money is an insurance company refund that belongs to them, have fired back with threats of libel suits.

●Millions of dollars more in pension reserves that retired players claim was theirs was used by the owners, with approval of the players' union, to pay for a new "security" package for current players in 1986 after the players began pressing for free agency....

●A portion of the profits earned by the players from international hockey goes into the pension fund. But, contrary to the impression of many players, the contributions do nothing to increase their NHL pensions. Instead, they offset contributions that the owners would have to make otherwise. Owners, meanwhile, get an equal cut of Canada Cup proceeds.....

19. The article reported the following two scenarios:

A firm headed by Eagleson himself collected money by "renting" Eagleson employees to Hockey Canada for international events, according to two former employees. As international hockey chairman, Eagleson got to choose employees for international events, from accountants to coaches and players. Rick Curran was one... he went to work in 1977 for Eagleson's Sports Management Ltd.

Curran said he was told "I would be paid a salary of $12,500 for that year with a chance to earn a bonus of $2,500." Soon after taking the job, Curran was also offered a job through Eagleson as road secretary for a Hockey Canada team headed to the world tournament in Austria. Curran said his six-month Hockey Canada contract "specified I was to be paid a salary of $15,000. I thought this was a great deal...." He said he did not find out there was a catch until after the tour was over and he got his check from Hockey Canada. "It was then that I was to learn that I was giving the check back," Curran said....

The arrangement between Eagleson and Curran was confirmed by Bill Watters, who ran Eagleson's Sports Management business and also worked for Hockey Canada. "The transaction was very simple. Rickey was being paid $12,500 on an annual basis from Alan Eagleson. Hockey Canada, I believe, was paying him $25,000. Rickey would get his check, give it back, Al would pay him what he was entitled to and take the rest."

Watters' own situation was slightly different. He said he was allowed to keep his Hockey Canada pay, but Eagleson held back his Sports Management pay. The bottom line, he said, was that "international hockey was paying me not only to administer the tournaments and their responsibilities but Eagleson's company as well." ...

Eagleson defended the practice in the 1984 *Sports Illustrated* article: "If I pay my guy 30 and rent him out for 50, that makes me smart."

(*Id.* at 10, some indentations omitted.)

sands of dollars in commissions. Two of these companies had been created by Eagleson, the report noted, while the directors of another included Eagleson's wife, his law partner, and his accountant. Overall, the report said, the three Canada Cups in the 1980's generated over $24 million in income, of which 75% went to pay operating expenses. (*Id.* at 9–10.)

The article also noted that the NHL knew of Eagleson's conflicts of interests, but had endorsed his claim that "A conflict is only improper if it's not announced." "Along with most hockey players," the report stated, "the league has long overlooked or tolerated Eagleson's conflicts of interest." (*Id.* at 8, describing interview with NHL President John Ziegler).

### 5.

In response to an Order, issued after the parties had filed two rounds of briefing on the instant motion, in which I noted "suggestions in plaintiffs' briefs that they have refrained from supplying certain evidence that they did not have notice of their claims before November 1991 ..." and observed that "[n]o discovery is required for plaintiffs to present evidence of what they did or did not know about their claims" (Order dated June 26, 1998), the five individual plaintiffs in this case submitted affidavits concerning their knowledge of their claims. As to their knowledge prior to November 1991 of the various publications described above, they state as follows.

### David S. Forbes

Forbes was an NHL player and NHLPA member from 1973 to 1978 and a WHA player in 1978–1979. He learned of and read the Garvey report for the first time in 1990. He states he has never read the *Sports Illustrated* article. As with other retired and current players, however, he received correspondence from Eagleson in late 1990 in which Eagleson referred to the *Sports Illustrated* allegations in the course of defending himself against charges Rich Winter had leveled at him in more memoranda to retired players. (Forbes Aff. ¶ 5, Ex. A (Memo from Alan Eagleson to All Members of the NHLPA Executive Committee and Player Representatives regarding "Rich Winter/Retired Play-

ers," December 10, 1990)). In one such memo to the union's then-deputy chief, Bob Goodenow, Winter sought information about and demanded the union investigate, *inter alia, Sports Illustrated* charges that Eagleson had pocketed money paid by international hockey for the services of his employees, maintained questionable financial ties to Arthur Harnett's companies, and charged illegitimate fees to players seeking disability insurance. (*Id.*, Ex. A (Winter letter dated November 2, 1990 at ¶¶ 8–20).)

From 1990 through 1991, Forbes persistently sought financial documentation from Eagleson, the NHLPA, the NHL, and Hockey Canada on international hockey, among other things. All consistently refused him any such documentation. All he obtained from Eagleson were representations that the international hockey venture was conducted in accordance with proper accounting and reporting methods and audited by a major accounting firm. In the spring or summer of 1991 Forbes learned that the FBI was investigating Eagleson. In 1992 Forbes received and read *The Eagle–Tribune* series; from those articles he first learned of Tikkanen–Muni labor complaint filed in 1991.

### Richard D. Middleton

Middleton played in the NHL and was a NHLPA member from 1974 to 1988. In late September or early October 1991 he read *The Eagle–Tribune* articles. From these articles he learned of the *Sports Illustrated* article and Garvey report, but has never read either. He learned in "late 1991 or early 1992" that the U.S. government had begun investigating Eagleson.

### Ulf Nilsson

Nilsson played in the NHL and was a member of the union from 1978 to 1983. He avers that he has "a vague memory of having been told by another person that an article had been published in *Sports Illustrated* about Eagleson and the fact that there were allegations in the article concerning Eagleson's wearing many different hats, resulting in possible conflicts of interests." However, he never read the article. Only since 1995 has he learned of the Garvey report and *The Eagle–Tribune* articles.

### D. Bradford Park

Park played for NHL clubs and was a member of the NHLPA from 1968 to 1985; he was a vice president of the NHLPA from 1972 to mid–1983. In 1989 he learned that Ed Garvey "had been attempting to investigate Eagleson's operation of the NHLPA and had issued an opinion of some type to the player representatives of the NHLPA." He never received a copy of or read the report. In September 1991 he read *The Eagle–Tribune* articles. (He thereby first learned of the *Sports Illustrated* article, but has never read it.)

### Douglas D. Smail

Smail played for NHL teams and was a member of the NHLPA from 1980 to 1993. He avers that he learned in 1989 that "Ed Garvey and some players were attempting to investigate the manner in which Eagleson was running the NHLPA," but to the best of his knowledge did not receive a copy of the report. He was unaware until 1995 of either the *Sports Illustrated* or *The Eagle–Tribune* articles.

In addition to these statements, each plaintiff states generally he did not and could not have known that Eagleson was illegitimately skimming profits from international hockey and taking bribes from the NHL defendants prior to the 1994 indictment.[20] Specifically, each contends he learned for the first time from the indictment that Eagleson was (1) secretly receiving money from the sale of advertising rights by the companies of Arthur Harnett, Irvin Ungerman, and other associates; (2) appropriating air travel passes given by Air Canada as payment for advertising rights; and (3) charging international hockey for excessive, illegitimate out-of-pocket expenses.[21]

With the exception of Forbes and Park (who inquired of the author of *The Eagle–Tribune* series and found out Eagleson was being investigated by the U.S. government), plaintiffs do not state whether they inquired into general allegations that Eagleson had serious conflicts of interest that might have lead him to betray the players' interest.[22] None of the plaintiffs states whether he was aware of specific allegations that Eagleson had charged illegitimate fees or derived other benefits from his control of disability insurance, subsidized his private businesses' expenses with international tournament money, or directed control over tourney advertising rights to close business associates.

### III.

Plaintiffs argue they were stymied from learning all the facts essential to their claim despite more than reasonably diligent attempts to do so because defendants failed

**20.** *See* Second Superseding Indictment, attached to plaintiffs' RICO Case Statement. In October 1997, Eagleson plead guilty to three counts of mail fraud associated with three schemes in which he (1) sold advertising rights for the Canada Cup and other international tournaments for money and Air Canada travel passes which he kept for himself and his associates without the knowledge of the union, the NHL, or Hockey Canada; (2) defrauded the NHLPA by charging it for illegitimate expenses and in-kind benefits and falsely representing to union members that all union expenses were in order; and (3) defrauded a client, player Glen Sharpley, by charging him for the travel expenses of insurance executive Bernard Warren. (Daly Aff., Ex. D.)

**21.** The carefully worded statements in the affidavits raise questions as to whether plaintiffs really mean to suggest they did not know of facts suggesting Eagleson was making excessive, unnecessary charges to international hockey for his personal benefit. (*See, e.g.*, Middleton Aff. ¶ 10: "I never knew that Eagleson was reimbursed from the international tournaments for out-of-pocket expenses in amounts which the U.S. government had concluded were excessive, unnecessary and unreasonable.")

**22.** Plaintiffs provide no evidence as to whether Garvey or Rich Winter or anyone else was acting on their behalf in investigating Eagleson's conduct. They seem to use Garvey's investigation both ways—implicitly alleging and arguing that his investigatory efforts fulfilled their duty of reasonably diligent inquiry, yet denying contemporaneous knowledge of his efforts or even (except for Forbes) any knowledge of his report's contents. I think it clear that if Garvey's inquiries are to be imputed to plaintiffs for purposes of establishing their diligence, then so must knowledge of the results of his investigation or, vice versa, if his knowledge is not to be imputed to plaintiffs, then neither are his investigative efforts. However, the relationship between Garvey and plaintiffs is ultimately not determinative of the timeliness of plaintiffs' claims; the result is the same even if plaintiffs are allowed to have it both ways.

to disclose and misrepresented financial documentation that would have informed plaintiffs of their claim. This argument is premised on plaintiffs' contention that the publications described above did not provide notice of all the facts necessary to bring this action, and therefore could not have provided plaintiffs with either actual or constructive notice of their claim.

I disagree, and find as a matter of law that plaintiffs' claims accrued prior to November 7, 1991.

### A.

First, there can be no doubt that plaintiffs had reason to inquire into possible wrongdoing by defendants—that is, had inquiry notice of their claim. Plaintiffs appear to concede as much (*see* Pls.' Surreply B. at 3–4) and obviously could not maintain they had no inquiry notice of their claims yet diligently sought to uncover them.[23]

Plaintiffs' affidavits show that each either read or was aware of the *Sports Illustrated, Eagle–Tribune,* or Garvey report prior to November 7, 1991. Forbes read the Garvey report in 1990, and both the Garvey report and subsequent correspondence among Forbes, Eagleson, and Rich Winter referred in a specific manner to *Sports Illustrated* allegations. Middleton read *The Eagle–Tribune* series in September or October 1991, and from them learned of the Garvey and *Sports Illustrated* reports. Park learned in 1989 of Garvey's investigation of Eagleson and that a report had been issued, and in September 1991 read *The Eagle–Tribune* series. Smail knew in 1989 of Garvey's investigation. Nilsson reports having "a vague

memory" of being told about the *Sports Illustrated* story and that it contained allegations that Eagleson had "possible conflicts of interest."

Moreover, plaintiffs have alleged that in November 1988 some player agents issued a paper "to the public" questioning Eagleson's conflicts of interest, *inter alia,* as head of international hockey; that between 1989 and early 1991 Eagleson sent mailings to all players—current and retired—specifically referring to and defending himself against the allegations of *Sports Illustrated,* Garvey, and Rich Winter (*see also* Forbes Aff. ¶ 5, Ex. A; Park Aff. ¶ 9; Smail Aff. ¶ 6); and that during the same period Eagleson made "numerous other statements to the players, purporting to document why concerns raised by Garvey and others were not accurate or well founded."

Thus, by early 1991 at the latest all plaintiffs knew or should have known of allegations that Eagleson had serious conflicts of interest and inadequately represented the players, and all either had learned of or, in the exercise of reasonable diligence, should have inquired into the allegations in the Garvey and *Sports Illustrated* reports. In addition, by October 1991 Middleton and Park had read *The Eagle–Tribune* articles.

### B.

Even the most cursory of perusals of any one of these three publications would have revealed to plaintiffs the gist of their claim: Eagleson was enriching himself by means of international hockey and the disability insurance and the NHL defendants knew so but apparently took no action to remove those

---

**23.** From supplemental briefs on the significance of the *Klehr* decision filed last year through the first two rounds of briefing on the instant motion for summary judgment, plaintiffs maintained the information available to them prior to 1994 was simply insufficient to give them notice of their cause of action; only when the Court expressly informed plaintiffs they would be expected to present evidence as to their own knowledge of their claims did they submit affidavits apparently attempting to throw doubt on their awareness of allegations such as those leveled by *Sports Illustrated* and Garvey. *Compare J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.,* 76 F.3d 1245, 1256–57 (1st Cir.1996)

("Guided by the principle that when reviewing motions for summary judgment, courts should 'pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required,' ... we view with significant skepticism what appears to be a last ditch effort to create a disputed fact where none exists.") (citations omitted); *Seawell v. Miller Brewing Co.,* 576 F.Supp. 424, 429 (M.D.N.C. 1983) (Ervin, J.) (general averments of ignorance in the face of evidence of widespread publication of issues of interest to plaintiffs insufficient to save plaintiffs' claims from statute of limitations bar).

opportunities from him. Moreover, examination of either the *Sports Illustrated* or *The Eagle–Tribune* article would have revealed almost every detail of the schemes plaintiffs now allege in their complaint, as well as sources to whom they could have gone for verification or further information. From them, plaintiffs learned or should have learned the following facts (as discussed below, plaintiffs contest in any significant way only their notice of the third fact listed below):

1. Eagleson controlled international hockey on behalf of the NHL–NHLPA joint venture and Hockey Canada. He controlled the organization, administration, expenses, and revenues of the tournaments.

2. Eagleson was indisputably benefitting himself and his associates from international hockey. For example, Eagleson admitted that he lent his employees to international hockey at higher rates than he paid them and pocketed the difference, and that he gave control of the sale of advertising rights to businesses headed by his close associate and client, Arthur Harnett.

3. Eagleson was possibly benefitting himself and his associates from international hockey in other ways he did not admit. For example, he might have controlled the Harnett companies to whom he gave tournament advertising rights and directly benefitted from their sales, and he might have subsidized his private businesses' office expenses by charging excessive amounts to international hockey just as he subsidized the salaries of his employees.

4. Eagleson's control over international hockey and its finances was not possible without the assent of the NHL defendants, who agreed to permit their players to play in the tournaments and agreed to Eagleson's leadership of the NHL–NHLPA partnership.

5. The NHL defendants knew or should have known, if only from the same public allegations of which plaintiffs were aware, of charges that Eagleson's control over international hockey was a conflict of interest and, more specifically, that Eagleson was enriching himself and his associates by means of international hockey. They nonetheless continued to permit their players to play in the tournaments and to allow Eagleson to run them without making any apparent move to police or otherwise constrain Eagleson's conduct.

6. Eagleson may have extorted personal benefits from brokers for placing disability insurance with them and may have charged players illegitimate fees for helping them get paid off on their union and NHL policies.

7. The NHL and Member Clubs allowed Eagleson to place their insurance funds despite notice of charges that he had leveraged this power for his personal benefit.

These facts were more than sufficient to provide plaintiffs with notice that the NHL defendants might be turning a blind eye to Eagleson's use of international hockey and NHL disability insurance funds to enrich himself, and thus with notice of a claim that both the NHL defendants and Eagleson were continuously violating § 302 of LMRA.[24] Indeed, on the basis of these facts

---

**24.** The complaint alleges that the NHL defendants paid or delivered "money or other thing of value" to Eagleson in violation of § 302(a) when they

> [¶ 46] ... granted Eagleson unsupervised control of the joint ventures which participated in the Canada Cup and other international tournaments and unsupervised control of funds generated by such tournaments belonging to the NHL and the Member Clubs, together with these defendants' knowledge of Eagleson's improprieties or their failure to hold Eagleson accountable as set forth in Paragraph 44 ...
> [¶ 47].... permit[ted] Eagleson to control the expenditure of NHL and Member Club funds to purchase disability insurance, as set forth in Paragraph 43, above ...

[¶ 49].... permit[ted] NHLPA players to participate in the Canada Cup and other international tournaments and ... place[d] Eagleson in unsupervised control of the joint ventures which participated in each tournament and the revenue generated therefrom, and [failed] to hold Eagleson accountable for the revenues generated from each such tournament, thereby allowing Eagleson to profit therefrom, from at least 1976 through early 1992 ...

Eagleson allegedly received or accepted "money or other thing of value" in violation of § 302(b) each time he

> [¶ 48] ... accept[ed] his position of domination and control over the joint ventures which participated in the Canada Cup and other international tournaments, and ... personally profit[ted] from the revenues from these inter-

plaintiffs could have actually plead almost every allegation in their complaint concerning defendants' alleged § 302 violations. That they may not have recognized that these facts added up to unlawful bribes is irrelevant.[25] *Keystone*, 863 F.2d at 1128.

Plaintiffs also knew or should have known of their alleged injuries. Each of the inadequacies in the Eagleson-negotiated collective bargaining agreements alleged in plaintiffs' complaint (*see* Comp. ¶ 51) were detailed in the Garvey report and most were also discussed in the *Sports Illustrated* and *The Eagle-Tribune* articles. Plaintiffs cannot seriously argue that players were unaware of their injuries as alleged in this action.

### C.

In contending that they lacked actual or constructive notice of their claim prior to Eagleson's indictment in 1994, plaintiffs do not argue that they were unaware of facts showing the alleged "pattern" element of their cause of action and do not seriously argue they were unaware of their possible injuries. Rather, plaintiffs' arguments center on their notice of defendants' alleged predicate acts—the § 302 violations. They contend that no matter how carefully examined the information available to them did not give notice of two facts essential to recognizing that defendants' conduct constituted such violations: that (1) the revenues Eagleson appropriated from international hockey tournaments were "illegitimate"; and (2) a portion of those revenues rightfully belonged to the NHL defendants.

### 1.

Plaintiffs argue that the payments Eagleson received from international hockey appeared to be within the exceptions of § 302(c) of LMRA, which makes certain payments from an employer to an employee representative lawful. They contend that

while it was known that Eagleson organized the international tournaments on behalf of the players, owners, and Hockey Canada, "[i]t appeared to any observer, including the players, that Eagleson was legitimately paid for his time and/or reimbursed for his out-of-pocket expenses incurred in running the tournaments. On their face, such payments would not violate § 302." (Pl. B. at 19.)

I disagree. No reasonable observer could have concluded that the payments Eagleson was reported to have received were either legitimate or within the exceptions of § 302(c).

Section 302(c) provides in relevant part:

The provisions of this section shall not be applicable (1) in respect to any money or other thing of value payable by an employer to ... any representative of his employees, or to any officer or employee of a labor organization, who is also an employee or former employee of such employer, as compensation for, or by reason of, his service as an employee of such employer ... (3) with respect to the sale or purchase of an article or commodity at the prevailing market price in the regular course of business ....

29 U.S.C. § 186(c)(1), (3).

As to § 302(c)(1), plaintiffs have neither alleged nor argued that Eagleson was or appeared to be an "employee" or "former employee" of the NHL with regard to his international tournament organizing, and it is clear on this record that they could not do so in good faith. *See* 29 U.S.C. § 152(3) (excluding independent contractors and supervisory employees from the definition of "employee" for purposes of Labor–Management Relations Act). Eagleson's reported improprieties therefore could not fit within the plain language of § 302(c)(1). Nor could such transactions reasonably have been construed as related to "the sale or purchase of an article or commodity," much less at "the

---

national tournaments, as set forth above, and ... accept[ed] control over the purchase of disability insurance.

**25.** In their affidavits, plaintiffs deny they knew or could have known of two of Eagleson's self-enriching schemes (discussed *supra* part C) but are conspicuously silent as to their awareness of other specific charges that Eagleson was benefit-

ting himself, his family, and his associates from his control over international hockey and disability insurance. The affidavits rest largely on conclusory statements that plaintiffs did not and could not know that Eagleson was accepting "bribes" or making profits to which he was not "legally entitled."

prevailing market price in the regular course of business."[26] Accordingly, Eagleson's conduct could not reasonably have been thought lawful under § 302. *See United States v. Ryan,* 350 U.S. 299, 305, 76 S.Ct. 400, 100 L.Ed. 335 (1956) (Section 302 "appears to be a criminal prohibition, *malum prohibitum,* which outlaws all payments, with stated exceptions, between employer and representative"); *United States v. Lanni,* 466 F.2d 1102, 1103–1105, 1108 (3d Cir.1972) (1959 amendments to § 302 were intended to close loop holes and "stamp[ ] out 'all forms of bribery' between management and labor officials").[27]

### 2.

Plaintiffs next assert that they had to know that a substantial portion of the international tournament revenues Eagleson was misappropriating rightfully belonged to the NHL defendants before they could know that the NHL defendants had violated § 302. Such could not be known, they say, until Eagleson was indicted in 1994.

This "fact," however, was and remains in no way essential to plaintiffs' claim. Plaintiffs' allegations premise liability on the theory that the NHL defendants were in violation of § 302 because they knowingly put and maintained Eagleson in a position to enrich himself.[28] According to plaintiffs' own theory, even if Eagleson were enriching himself only at the expense of third parties rather than with NHL funds, both he and the NHL defendants were nonetheless in violation of § 302. (*See* Comp. ¶¶ 44, 46–50.)[29]

---

**26.** For example, the descriptions in both *Sports Illustrated* and *The Eagle–Tribune* of how Eagleson sold advertising rights to companies nominally owned by Arthur Harnett compel the conclusion that Eagleson was using international hockey to benefit his personal associates and, further, strongly suggest that Eagleson sold (or undersold) tournament advertising rights to one or more companies he or his family controlled. *See also supra* note 14 (similar suggestion in Garvey report). Similarly, in reporting how Eagleson lent his private employees to international hockey at rates much greater than those he paid them, both articles made clear that (however one wanted to look at it) Eagleson was either charging exorbitant, above-market fees for his employees or was having international hockey carry part of the salary expenses for Eagleson's private business. In neither of these cases could it have reasonably been thought that Eagleson was selling "article[s] or commoditie[s] at the prevailing market price in the regular course of business." *Compare, e.g., United States v. DeBrouse,* 652 F.2d 383, 386–87 (4th Cir.1981) (affirming convictions for violations of § 302 where defendant labor official accepted goods from employers with no intent to pay prevailing price for them; sought and obtained employer's agreement to make payments to a third party; and steered employer to contract for certain services with a firm which employed his son and in which he held an undisclosed ownership interest).

**27.** Without claiming so expressly, plaintiffs argue as though § 302(c) provides an exemption for "legitimate" payments to a labor representative for services just like it exempts payments for articles or commodities sold at prevailing rates in the ordinary course of business. *See, e.g.,* Pl. B. at 16 ("The gravamen of a § [302] violation is that the union leader has received funds ... from the employer ... other than for services rendered or ... for more than the fair price of the

services or commodity delivered to the employer.") If this suggestion were indeed correct, bribes could flow freely and legally through private businesses established by labor officials: labor officials could freely extort the business of employers and employers freely steer business to them.

In fact, even if "legitimate" in the sense that the employer pays no more for services than others, such scenarios present obvious financial conflicts and are plainly prohibited by the statute. *See, e.g., United States v. Burge,* 990 F.2d 244 (6th Cir.1992) (affirming conviction of labor official for receiving payments from employer of potential union members for the "consulting" services of his private firm); *United States v. Overton,* 470 F.2d 761, 764–66 (2d Cir.1972) (affirming convictions of labor officials who solicited business of employers for their private public relations services). The law provides only a narrow exception for an employer's payments to an employee as compensation for his or her work as an employee.

**28.** *See supra* note 24.

**29.** Plaintiffs' theory appears to reflect accurately the legal insignificance of whether Eagleson was using powers given him by the NHL defendants to pilfer their funds as well as that of third parties. If he was doing either or both with the NHL defendants' acquiescence, he and they were in violation of § 302. *See Haley v. Palatnik,* 509 F.2d 1038, 1041 (2d Cir.1975) ("There is nothing to require that, in order to constitute a violation of § 302(a) and (b) the moneys agreed to be paid to the union representative or official be paid from the employers' funds."); *United States v. Ferrara,* 458 F.2d 868, 872–73 (2d Cir.1972) (defendant labor officials obtained thing of value in violation of § 302 where employer promised to

Moreover, plaintiffs do not explain what information available to them only after November 1991 finally lead them to learn that Eagleson must have been taking NHL money. The indictment provides no information in this regard not already apparent from the international hockey profit-sharing agreement between the NHL and the NHLPA enshrined in their collective bargaining agreements beginning in 1976.[30]

3.

Plaintiffs also assert that some of Eagleson's schemes remained wholly hidden and could not have been uncovered until the 1994 indictment, citing Eagleson's appropriation of thousands of dollars worth of travel passes and other in-kind benefits paid by Air Canada and other businesses in exchange for international tournament advertising rights, and his pocketing of proceeds from the sale of Canada Cup advertising rights between 1984 and 1991 by All Canada Sports Promotions, Ltd., the firm owned by a close associate, Irvin Ungerman, to which Eagle-

son gave control of advertising rights. (Comp.¶¶ 38–39).

■■■■ Even assuming plaintiffs could not have learned of these schemes in the exercise of reasonable diligence prior to Eagleson's indictment.[31] the limitations period generally will not be tolled merely because plaintiffs did not know all the predicate acts encompassing the pattern of racketeering alleged in their complaint. *See Davis v. Grusemeyer*, 996 F.2d at 625, n. 16 ("[T]he question is not when Davis knew each and every predicate act charged in the complaint, but when he knew, or with reasonable diligence, should have known that defendants' conversion of the stolen 1985 Seville was part of a developed pattern of racketeering. (Indeed, a RICO plaintiff need not even allege each and every predicate act that is part of the pattern …")). If plaintiffs had to know all the wrongdoing eventually alleged in their complaint before their claims even accrued, the statute of limitations would be essentially meaningless.[32]

buy coffee from supplier identified by officials, and supplier made annual payments to officials); *cf. United States v. Lanni*, 466 F.2d 1102, 1107–09 (3d Cir.1972) (§ 302(a) and (b) express clear intention "to forbid indirect union official—management bribery"); *United States v. Overton*, 470 F.2d 761, 765 (2d Cir.1972) (indirect scheme of payments by employer to employee representative through non-employer corporate entities is in violation of § 302); *United States v. Iozzi*, 420 F.2d 512, 515 (4th Cir.1970) (same).

30. Pursuant to the profit-sharing agreement, the NHL and the NHLPA split revenues from the Canada Cups net of operating expenses (including Hockey Canada's $600,000 fee). As each Canada Cup reportedly generated millions of dollars in revenue, both plaintiffs and the NHL defendants therefore had at least constructive notice that any potential revenue lost or additional expenses incurred as a result of Eagleson's schemes likely reduced the net proceeds to be split by the NHL and the union. *See* Forbes Aff., Ex A. (Forbes' Memo to File reporting December 13, 1990 meeting with Eagleson ("I mentioned how I had noticed in the CBA that the players' share was a function of 'net proceeds' and that he [Eagleson] knew as well as I that 'net' can be just about whatever you want it to be.")(alteration added)); *id.*, Ex. D (letter from Forbes to Bob Goodenow dated January 4, 1991) (similar).

31. While it appears that neither of these schemes was fully illuminated until Eagleson's indictment, there was information sufficient to constitute inquiry notice of them. *Sports Illustrated*

reported: "Eagleson also says he receives 'an unlimited' number of passes from Air Canada for the business he does with them. Once again, where Eagleson's personal business ends and his representation of hockey players begins is blurred. The only things that are clear are that Eagleson receives many free passes, and he decides who gets to use them." While this statement does not suggest one way or the other that the passes were linked to Canada Cup advertising rights sales, in combination with other questionable transactions detailed in the article it should have raised sufficient suspicion to require investigation.

Similarly, reports in both *Sports Illustrated* and *The Eagle–Tribune* that Eagleson had made a practice since 1972 of giving control of tournament advertising rights to a close business associate who was possibly little more than his agent should have prompted inquiry into his practices in subsequent tournaments. *Cf. Davis*, 996 F.2d at 625 (plaintiff caught in sting operation in which law enforcement officials ran "chop shop" for stolen cars could not reasonably have believed he was the shop's only customer and failure to investigate possible pattern of officials' alleged wrongdoing was inconsistent with reasonable diligence). There is no evidence plaintiffs ever investigated either Eagleson's receipt of travel passes or his control of tournament advertising.

32. Indeed, according to plaintiffs much about Eagleson's subterfuge did not come to light until hearings in January 1998 in which Eagleson

This general rule is soundly applied here. The gravamen of plaintiffs' claim is a collusive arrangement between Eagleson and the NHL defendants that resulted in collective bargaining agreements disadvantageous to the players. Knowing every way in which Eagleson used international hockey to enrich himself was unnecessary for plaintiffs to have notice that defendants had maintained such an arrangement in continuous violation of § 302. In fact, even without the benefit of further investigation during the limitations period, plaintiffs could have plead all but two of their allegations concerning Eagleson's self-enriching schemes—neither of them essential to their claim (*see* Comp. ¶¶ 38–39)— based on the charges in *Sports Illustrated* or *The Eagle–Tribune* alone. (*See* Comp. ¶¶ 36– 44.) [33]

### 4.

Finally, plaintiffs claim that even if published reports did give notice of the necessary facts, they could not have plead a cause of action based upon mere news articles consistent with Federal Rule of Civil Procedure 11. *See* Rule 11(b) (by signing pleading, attorney certifies that after "an inquiry reasonable under the circumstances . . . the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery"). Assuming without deciding that plaintiffs are correct in asserting that a lawsuit may never be brought on the strength of news articles alone, this contention is nonetheless wholly unpersuasive.

I do not suggest that plaintiffs should have brought suit merely upon the representations in news articles. Rather, these sources gave notice of both the existence of plaintiffs' potential claim and sources of whom plaintiffs could have inquired for verification and further information. Plaintiffs would have acted consistent with Rule 11 had they simply contacted sources cited by *Sports Illustrated* or *The Eagle–Tribune* to verify those articles' charges.[34] With regard to the Garvey

---

plead guilty to Canadian charges illuminated how he had funneled international tourney money through businesses nominally owned by others to himself, his law firm, and businesses controlled by his family. (*See* Pls. B. at 27.) Since these hearings were held several years after the filing of the complaint in this action, plaintiffs cannot be heard to argue that such details were necessary to pleading this action.

**33.** The complaint summarizes plaintiffs' § 302 allegations as follows:

44. At all times relevant hereto, up to and including the present date, [the NHL defendants] knew that Eagleson was utilizing his position of control over the purchase of disability insurance and control over the Canada Cup and other international tournaments to enrich himself, in part, with funds otherwise belonging to the NHL and its Member Clubs, as described in Paragraphs 37 through 43 above or, in the alternative, [the NHL defendants] knowingly failed to hold Eagleson accountable for the proceeds of the Canada Cup and other international tournaments and the purchase of disability insurance, which failure continued even after said defendants were put on notice that Eagleson likely was enriching himself: (a) from the use of NHL and Member Club funds to purchase disability insurance; (b) from Canada Cup and other international tournament revenues, by, at a minimum, causing Hockey Canada to reimburse Eagleson-owned companies for the use of those companies' employees at rates higher than Eagleson was paying them; (c) by profiting from the sale of television rights to international tournaments; and (d) by receiving benefits from insurance brokers. Further, these defendants knew that Eagleson would not have had the opportunity to engage in such profit making schemes had they not agreed to place him in control of the purchase of disability insurance or granted him unsupervised control of the joint ventures' involvement in the Canada Cup and other international tournaments, as described above, while failing to hold him accountable for the proceeds therefrom.

One or more examples of each of Eagleson's alleged schemes (a) through (d) could have been plead based on information in *Sports Illustrated* or *Eagle–Tribune*.

**34.** Thus, plaintiffs' reliance on *Greenfield v. U.S. Healthcare*, 146 F.R.D. 118 (E.D.Pa.1993), in which the court sanctioned an attorney who brought a securities action merely on the basis of an article in the Wall Street Journal and a complaint filed by another attorney, is not helpful to their cause. While concluding that "reliance across the board on a Wall Street Journal article alone, without some form of independent inquiry, is insufficient to satisfy the requirements of Rule 11," *id.* at 127, the court found that another attorney who had conducted some research to verify the accuracy of the news report had conducted reasonable inquiry under the circumstances. *Id.* at 124.

report, moreover, plaintiffs had available not mere journalism, but the result of extensive investigations by lawyers and player agents, among others, written by a lawyer. (See, e.g., Second Supp. Garvey Aff. ¶¶ 5–10.) I am inclined to think such a report would of itself be sufficient foundation for a lawsuit; at any rate, plaintiffs could have assured themselves of compliance with Rule 11's mandate by inquiring of the report's contributors and author as to the evidence supporting their charges.

### D.

■ Since plaintiffs had notice of all the elements of their claim prior to November 1991, any claims for injuries incurred before that date are barred unless the statute of limitations was tolled because defendants affirmatively mislead them as to the nature or significance of those facts so as to prevent plaintiffs from recognizing their cause of action.

■ Most of defendants' alleged concealment amounts to denials of wrongdoing and refusals to provide financial documentation. Mere denials of wrongdoing will not of themselves toll the statute of limitations. See, e.g., Pocahontas Supreme Coal Co. v. Bethlehem Steel, 828 F.2d 211, 218–18 (4th cir.1987); Volk v. D.A. Davidson & Co., 816 F.2d 1406, 1416; Bausch v. Philatelic Leasing, Ltd., 728 F.Supp. 1201 (D.Md.1990). Nor will the statute be tolled because a defendant refuses to disclose a smoking gun to a plaintiff already on notice of his or her cause of action. See Pocahontas, 828 F.2d at 218–19. The plaintiff may, of course, collect

further information during the limitations period and, to the extent stymied, seek it in discovery. But the running of the limitations period will not await the plaintiff's satisfaction as to the merits of his or her case, much less the defendant's voluntary self-incrimination.[35] Id.; cf. Cada, 920 F.2d at 451.

The only alleged acts of concealment of a potentially misleading nature were Eagleson's claims that independent audits by outside accounting firms had verified that the finances of international hockey and the NHLPA were in order.[36] In light of his fiduciary duties to union members and the persistence of his accusers' allegations and attempts to obtain information, however, Eagleson's continuous refusal to release financial information and audits which purportedly cleared him of wrongdoing could not reasonably be interpreted as anything other than further evidence of possible wrongdoing.[37]

Moreover, Eagleson's misrepresentations could not have mislead plaintiffs as to the facts essential to their claim. Naked representations that international hockey finances were audited and in order could not, for example, negate the claims of several former Eagleson employees and Eagleson's own admission that he had subsidized the salaries of his private employees with international hockey money, or undo Eagleson's admission that he gave control of Canada Cup advertising rights to a close associate whom various other sources claimed he controlled, or obscure insurance brokers' and players' claims that he had used his control over disability insurance to extort legal fees and other personal benefits from them.[38] Compare Salois

---

**35.** Plaintiffs do not allege that they ever obtained the financial data they sought from Eagleson and others, yet they nonetheless eventually managed to file this suit.

**36.** Only plaintiffs Forbes, Park, and Smail suggest in their affidavits that they were mislead at the time by Eagleson's 1990 representations about purported audits.

**37.** Cf. Bausch v. Philatelic Leasing, Ltd., 728 F.Supp. 1201, 1207 (D.Md.1990) ("plaintiffs were given legally sufficient notice as to their potential causes of action. Therefore, they were not justified in relying on the assurances of the potential defendants to justify their failure to investigate further."); Hodas v. Sherburne, Pow-

ers & Needham, 938 F.Supp. 60, 63 (D.Mass. 1996) (similar).

Indeed, the record demonstrates that the purported audits did not assuage plaintiff Forbes' concerns about international hockey. (See Comp. ¶¶ 101–115; Forbes Aff., Ex. J. K.)

**38.** Plaintiffs' argument that Eagleson's (or the NHL defendants') refusals to disclose financial documentation or admit wrongdoing were sufficient to toll the statute of limitations because he owed a fiduciary duty of disclosure to the players fails for the same reasons. "A fiduciary's lie or failure to disclose significant information is relevant only if it actually conceals an injury from the plaintiff." Hodas, 938 F.Supp. 60, 64 (D.Mass.1996); see also Salois v. Dime Savings

*v. Dime Savings Bank,* 128 F.3d 20, 26 (1st Cir.1997) (even if defendant had misrepresented allegedly fraudulent loans, statute not tolled where the loan documents themselves contained all information necessary to put plaintiffs on notice of the fraud).[39]

Plaintiffs' reliance on the doctrine of fraudulent concealment also fails because they do not show that information adequate to alert them to their claim came to light only subsequent to (or despite) defendants' concealment and within the statute of limitations period. *See Salois,* 128 F.3d at 26, n. 9. Plaintiffs assert that it was the indictment which finally provided them with sufficient notice to file suit. The indictment, however, simply reiterated or elaborated upon Eagleson's self-enriching schemes already detailed or hinted at years earlier in the *Sports Illustrated* and *The Eagle–Tribune* articles and Garvey report, and none of what little information it did reveal was essential to plaintiffs' claims.

To summarize, I find (1) it is undisputed and indisputable that plaintiffs had inquiry notice of their claim by 1990 at the latest; (2) in the exercise of reasonable diligence plaintiffs should at the very least have inquired into the specific factual allegations in the Garvey and *Sports Illustrated* reports; (3) these reports, as well as *The Eagle–Tribune* articles read by two plaintiffs, provided notice to plaintiffs by October 1991 at the latest of more than sufficient facts to show the existence of their claim that the NHL defendants and Eagleson had engaged in a pattern of § 302 violations resulting in inadequate representation and bad deals for the players; and (4) no reasonable jury could find that plaintiffs were mislead as to their cause of

action so as to toll the statute of limitations. Accordingly, I conclude that plaintiffs' claims to injuries incurred prior to November 7, 1991 are barred as untimely.

## IV.

■ The statute of limitations does not bar claims for any "new and independent injuries" incurred by plaintiffs after November 7, 1991 as a result of defendants' alleged racketeering activity. *See e.g., Glessner v. Kenny,* 952 F.2d 702, 707–08 (3d Cir.1991). Defendants argue that there can be no such injury because the last collective bargaining agreement negotiated by Eagleson expired in September 1991 and the next bargaining agreement, negotiated by Eagleson's successor, Bob Goodenow, was signed in January 1993 and effective retroactive only to April 1992.

Plaintiffs argue that Eagleson and the NHL defendants, pursuant to their alleged arrangement, may have undermined Goodenow's collective bargaining negotiations and even contributed to an April 1992 strike by the players. However, other than the general allegation that the players' compensation was artificially suppressed from the mid–1970's through the end of 1991 (Comp.¶ 54), there are no allegations in plaintiffs' fourth amended complaint of such injury or of such wrongdoing. Accordingly, in addition to granting defendants summary judgment with respect to Count I insofar as it asserts claims for injuries incurred prior to November 7, 1991, I will dismiss the remainder of Count I for failure to state a claim upon which relief may be granted.

*Bank,* 128 F.3d 20, 26 n. 11 (1st Cir.1997) ("even if plaintiffs' allegations regarding fraud and fiduciary duties are true, plaintiffs still fail the ultimate test, that of reasonableness in discovering and pursuing their claims").

**39.** Plaintiffs Park and Smail also suggest in their affidavits that they were mislead by the player representatives' failure to fire Eagleson in 1989 after Garvey released his report. They do not say whether they were aware of the nature of the representatives' vote—a close one which Eagleson survived only after promising to seek a successor, to terminate his management of international hockey, and to disclose personal and union financial information (Pls. B. at 41).

Since Park read *The Eagle–Tribune* articles long after the player representatives' vote, he could not have been mislead by that vote as to facts reported in those articles. More generally, even assuming the player representatives' vote could somehow be imputed to defendants as fraudulent concealment which might toll the statute of limitations, no reasonable jury could find that relying on such a vote as assurance that Eagleson had committed no wrongdoing was reasonable or consistent with plaintiffs' duty of diligent inquiry. And most importantly, as with Eagleson's representations about audits the player representatives' vote could not negate the facts of which plaintiffs were or should have been aware showing the existence of their claim.

V.

The accompanying Order disposing of Count I appears to warrant entry of final judgment qualifying for immediate appeal pursuant to Federal Rule of Civil Procedure 54(b). However, it is plaintiffs' burden to demonstrate that such certification is appropriate and just. *See e.g., Anthuis v. Colt Industries Operating Corp.*, 971 F.2d 999, 1003 (3d Cir.1992) and *Forest Electric Corp. v. HCB Contractors*, 1995 WL 429141, at *2 (E.D.Pa.1995), both citing *Allis–Chalmers Corp. v. Philadelphia Electric Co.*, 521 F.2d 360 (3d Cir.1975). Accordingly, I will make provision in the Order for plaintiffs to seek such certification should they wish to do so.

### ORDER

AND NOW this 27th day of August, 1998, upon consideration of defendants' motions to dismiss or for summary judgment and the parties' filings related thereto, and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

(1) The motion of the NHL defendants as to Count I of plaintiffs' complaint is GRANTED in its entirety: (a) judgment is entered in favor of defendants National Hockey League (NHL), the NHL Member Clubs, John Ziegler, William W. Wirtz, and R. Alan Eagleson and against plaintiffs David S. Forbes, Richard D. Middleton, D. Bradford Park, Ulf Nilsson, and Douglas D. Smail as to plaintiffs' claims for injuries incurred prior to November 7, 1991; and (b) plaintiffs' claims against these same defendants for injuries incurred on or after November 7, 1991 are dismissed for failure to state a claim upon which relief can be granted.

(2) The motion of the Canadian defendants, Jialson Holdings, Ltd., Sports–Management Ltd., Rae–Con Consultants Ltd., and Eagleson, Ungerman, to dismiss or for summary judgment as to Count II is DENIED without prejudice to renewal.

(3) If plaintiffs wish to seek certification of this Order pursuant to Rule 54(b) of the Federal Rules of Civil Procedure they should so move by September 30, 1998.