Martin HODAS, Plaintiff,

v.

SHERBURNE, POWERS & NEEDHAM, P.C., Mark Schonfeld, Administrator/Executor of the Estate of Munroe Sussman; Barbara Zimmerman a/k/a Barbara Schonfeld; and Margaret Rodell, Defendants.

Civil Action No. 96–10317–GAO.

United States District Court, D. Massachusetts.

Aug. 16, 1996.

Matthew Cobb, Boston, MA, for plaintiff.

Gael Mahoney, Amy B. Rifkind, Michael D. Weisman, Boston, MA, for defendants.

*MEMORANDUM AND ORDER*

O'TOOLE, District Judge.

In this suit, the plaintiff Martin Hodas alleges civil violations by the defendants of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* The defendants have moved to dismiss the complaint for the reason that the claims are barred by the applicable four-year statute of limitations. The Court grants the motion.

## I.

■ The facts as the plaintiff alleges them are as follows:[1] In 1986, Hodas was an active real estate investor living in New York. He became interested in investing in the New England real estate market and began discussions with Munroe Sussman regarding this matter. Sussman told Hodas that he had a "big operation" in Boston known as "Security Mortgage Corporation" and that he had a lawyer and a major Boston law firm, Mark Schonfeld and Sherburne, Powers & Needham respectively, who were prepared to act as their attorneys for any proposed transactions. After further negotiations, Hodas and Sussman entered into an agreement whereby Sussman and Security Mortgage Corporation would arrange real estate loans in New England with Hodas providing all of the capital for the loans.

---

1. For the purposes of this motion to dismiss, the Court accepts as true all well-pleaded facts and draws all reasonable inferences therefrom in the light most favorable to Hodas. *Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 52 (1st Cir. 1990).

Each loan was to be secured by a mortgage and subject to the condition that the amount lent not exceed fifty percent of the net equity of the mortgaged realty.

After the agreement with Hodas, Sussman began advertising Security Mortgage loans in the New England area. The typical deal proceeded as follows: Security Mortgage advertised in New England newspapers the availability of loans for those in need of funds quickly. A potential borrower would call the advertised number, which would forward the call to Sussman's New York office. Sussman's secretary, Margaret Rodell, would then call Schonfeld, who would organize the loan papers and any appraisal of the property that would be used to secure the loan. Sussman and Schonfeld would confer and then contact Hodas. Hodas, after being assured that the loans met his fifty percent loan-to-value requirement, would forward loan funds to Schonfeld. The loan would subsequently be finalized at a closing, at which Schonfeld received his attorney's fees and Sussman his "points" for arranging the loan. All loans were one-year loans requiring monthly interest payments and a balloon payment at the end of the one-year term. Between 1986 and 1990, Hodas made 109 loans through this plan.

Although initially successful, loans began to fail in 1987 and continued to do so with increasing frequency. Of the thirty-one loans Hodas made in 1989, nineteen failed. Of the ten loans made in 1990, eight failed. Faced with such high rates of failure, Hodas finally decided to stop making these loans.

In retrospect, the growing failure rate makes complete sense, according to Hodas, because the whole program was a grift designed to extract money from him. Schonfeld was charging exorbitant attorney's fees (three times normal fees), and Sussman was exacting an unreasonably high sum (up to twenty percent of loan proceeds) for his brokering each loan. At the same time, most of the property appraisals were performed by Schonfeld's wife, Barbara Zimmerman, who, it turns out, is also Sussman's ex-wife, under an assumed name. Hodas alleges that Zimmerman would routinely inflate the value of the appraisals in order to meet Hodas's loan-to-value requirement for any loans. Thus, Sussman and Schonfeld were presenting loans to Hodas that he would never have approved had he known the true facts. The high fees served to make already precarious loans extremely difficult to repay. When the loans predictably failed, however, Hodas would usually be left with nothing because the inflated appraisals meant that his security (often a second or third mortgage) would often be extinguished in a foreclosure sale. Hodas also asserts that Sussman's initial representation to him that he had an established office and reputation in New England was a lie calculated to lure him into the venture.

By 1990, Hodas realized that his loans were not profitable and stopped making them. He made his last loan on June 28, 1990, and that borrower defaulted one year later. The entire scheme, according to the complaint, eventually cost him nearly $2 million. First Amended Complaint ¶ 72.

Hodas claims that, beginning in March, 1992, he slowly grasped the illicit nature of the defendants' acts, realizing that the defendants had arranged the loans solely to extract sizable brokerage commissions and attorney's fees at the closings without any real regard for whether the borrowers could repay the loans. He continued to use Sherburne, Powers as his firm until 1995, however, when he was finally able to extricate himself from his relationship with them. On February 16, 1996, Hodas filed the present suit alleging violations of RICO, 18 U.S.C. § 1962(a), (b), and (d), because of the defendants' conspiratorial acts in using interstate mails and wires to defraud him. He later amended the complaint to add substantially more detail and change the § 1962(b) count to § 1962(c).

## II.

Both parties agree that civil RICO's four-year statute of limitations applies to the case. *Rodriguez v. Banco Central*, 917 F.2d 664, 665 (1st Cir.1990). Since the case was filed on February 16, 1996, the relevant date for all events is February 16, 1992. Hodas's claim is barred if, before that date, he "knew or should have known of his injury." *Id.*

Looking at the facts as pleaded in the complaint, what Hodas knew before February 16, 1992, was more than enough to put him on notice of his asserted claims. Hodas knew as early as June 28, 1990, when he made his last loan, that many of the loans were going bad and that he had to stop. He knew by June 28, 1991, that forty of them had not been paid in full. By February 16, 1992, he knew that default notices had been sent and bankruptcy and/or foreclosure proceedings commenced in thirty-nine of the forty cases. He knew that there had been twenty-one foreclosures or other sales occasioned by the defaults prior to February 16, 1992, and that all twenty-one had resulted in deficiencies that often left him without recourse to any security. Even if he did not know anything about the fees and commissions being charged or the alleged duplicity of Sussman, Schonfeld and the other defendants, he was clearly aware of his monetary losses.

Hodas's plea that he did not know of the "conduct" that caused his injury is clearly insufficient to alter the accrual date of his claim. It is the injury and not the fact that it is specifically a "RICO" injury that is relevant. *See McCool v. Strata Oil Co.,* 972 F.2d 1452, 1465 (7th Cir.1992) (noting in following the First Circuit that "a RICO claim accrues when the plaintiff discovers her injury, even if she has not yet discovered the pattern of racketeering"). More or less recognizing that fact, Hodas falls back on the argument that the defendants fraudulently concealed the scheme until at least March 1992, thereby tolling the statute of limitations until that later time. *See Rodriguez,* 917 F.2d at 667–68.[2]

"To invoke the doctrine of fraudulent concealment, a plaintiff must plead and prove three elements: '(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts.'" *Berkson v. Del Monte Corp.,* 743

F.2d 53, 55 (1st Cir.1984) (quoting *Dayco Corp. v. Goodyear Tire & Rubber Co.,* 523 F.2d 389, 394 (6th Cir.1975)), *cert. denied,* 470 U.S. 1056, 105 S.Ct. 1765, 84 L.Ed.2d 826 (1985). The mere assertion that fraud underlies a claim is insufficient to state a fraudulent concealment claim; rather, there must be an effort to conceal the facts that might lead one to suspect anything. *See Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.,* 828 F.2d 211, 218–19 (4th Cir.1987); *Berkson,* 743 F.2d at 56. Otherwise, RICO suits containing fraud allegations would never be time barred, and the statute of limitations period would be meaningless.

The information available to Hodas prior to February 16, 1992, about the loans and the problems with them effectively renders his claim of fraudulent concealment untenable. He knew the loans were failing; it was not enough for him, especially since he disavows any claim to being an unsophisticated investor, to rely on the defendants' assertions that it was simply the declining real estate market that hurt him and to forego any diligent inquiry himself. *See J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.,* 76 F.3d 1245, 1259–60 (1st Cir.1996), *petition for cert. filed,* 65 U.S.L.W. 3001 (June 19, 1996).

One of Hodas' allegations itself undermines the fraudulent concealment assertion. Central to the fraud Hodas alleges were the high fees and commissions the defendants charged at the closings. Hodas asserts that Sussman had instructed the other defendants never to send him any closing statements, since they would have revealed these high fees to Hodas. Complaint ¶ 27. To emphasize how high the fees and commissions were, Hodas avers that several borrowers sued him on account of these high closing costs, alleging unfair and deceptive trade practices. Complaint ¶ 37. One demand letter asserting such claims on behalf of a borrower was sent to him in June 1991. That letter states in no uncertain terms the borrower's claim that the closing charges were too high. *See* Aff. of Gail Poulos, Ex. 32 at 6; Second Aff.

2. *Rodriguez* actually leaves open whether fraudulent concealment operates to toll the statute of limitations for a RICO action. *Rodriguez,* 917

F.2d at 668. For the purposes of this memorandum, the Court assumes that it could and notes that neither side has argued to the contrary.

of Gail Poulos, Ex. A. After receiving that demand letter, he knew, first, that his loans were failing at a very high rate, and second, that at least one borrower was attributing his inability to repay to the high fees deducted from the loan proceeds at closing. It might be possible for Hodas to maintain that he did not know some relevant specifics of scheme, but it is not possible that, having been served with a demand letter describing the very conduct of which he now complains, he was not on notice about that conduct.

Hodas relies on Chief Judge Tauro's decision in *Cogburn v. United States,* 717 F.Supp. 958 (D.Mass.1989), for the proposition that excessive delay in filing a complaint is excusable where a fiduciary has assured the plaintiff that nothing is wrong. In *Cogburn,* the plaintiff was allowed to proceed against doctors who had allegedly misdiagnosed him and conspired to cover up the misdiagnosis, despite the patient's own awareness of the illness from a different doctor. The plaintiff was not barred, Judge Tauro ruled, because he had asked the defendant doctors for the relevant information and they had provided false records. *Id.* at 963. Thus, Hodas reasons, when Schonfeld, who served Hodas as a fiduciary, told Hodas that it was just a bad market, that deception should meet the requirements for his pleading of fraudulent concealment and obviate any obligation he had to inquire further into the matter.

■ While *Cogburn* suggests that more leeway be allowed where one reasonably relies on the advice of certain close persons, what Hodas neglects to point out in mentioning *Cogburn* is the relevant standard that case adopted. Following *Hohri v. United States,* 782 F.2d 227 (D.C.Cir.1986), *vacated on other grounds,* 482 U.S. 64, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987), *Cogburn* noted that equitable tolling should be allowed under a claim of fraudulent concealment only where "the material facts which defendant is alleged to have fraudulently concealed are so

crucial that without them plaintiff has no reasonable basis to even initiate legal action." *Cogburn,* 717 F.Supp. at 962. The *Cogburn* plaintiff was affirmatively prevented from discovering anything that might lead him to think his doctors had practiced a fraud. No such condition obtains here. Hodas had information that the loans were going bad and knew that loan recipients were complaining of high fees. The availability of that information makes unreasonable any reliance by Hodas on Schonfeld's assurances that all loan problems were related to the deterioration of the New England real estate market. A fiduciary's lie or failure to disclose significant information is relevant only if it actually conceals an injury from the plaintiff. *See In re Atlantic Fin. Management, Inc. Sec. Litigation,* 718 F.Supp. 1003, 1011 (D.Mass.1988). That Schonfeld, as a fiduciary to Hodas, might have put Hodas off the trail at some points or failed to inform him other misdeeds does not countervail the overwhelming evidence, including that pled by Hodas himself, that he knew something was amiss well before February 16, 1992. *See J. Geils Band,* 76 F.3d at 1259–60; *Butala v. Agashiwala,* 916 F.Supp. 314, 320 (S.D.N.Y.1996); *Lenz v. Associated Inns & Restaurants Co. of America,* 833 F.Supp. 362, 373–75 (S.D.N.Y.1993).

Hodas does allege that defendants hid from him several facts, including the failure to make the loans in accordance with the fifty percent rule, the virtually nonexistent nature of the Security Mortgage, the fact that the independent real estate appraiser was Schonfeld's wife, the exorbitant closing fees,[3] Sussman's criminal history, and the substandard conditions of many of the secured properties. *See* Amended Complaint ¶¶ 17, 22, 23, 26, 31–32, 38–40. Hodas claims he never received even one closing statement until March 1993, after he demanded them from Schonfeld. *Id.* ¶ 26. But it is not enough, assuming it to be true, that the defendants hid material evidence from Hodas. They must have concealed so much that he could not reasonably

---

3. It should be noted that Hodas' own pleading on this point seems contradictory. On the one hand, he claims exorbitant attorney's fees for closings averaging between $3,000 and $5,000. First Amended Complaint ¶ 45. On the other hand, he alleges in paragraph 28 that "Schonfeld

acted as the closing attorney, making all requisite disbursements and charging over $180,-000.00.00 [sic] in legal fees for himself and the Defendant law firm." The latter sum, spread over 109 closings, averages to about $1,651 per closing.

have discovered the cause of action through his own diligent inquiry. This Hodas has not pled. Considering what he has pled, it is apparent he knew enough that the limitations period was not tolled.

Finally, Hodas suggests that his pleading of RICO conspiracy would circumvent the defendants' statute-of-limitations argument because "[t]he statute of limitations for a RICO conspiracy does not begin to run until the objectives of the conspiracy have been either achieved or abandoned." *United States v. Eisen,* 974 F.2d 246, 264 (2d Cir. 1992), *cert. denied,* 507 U.S. 1029, 113 S.Ct. 1840, 123 L.Ed.2d 467 (1993); *see also United States v. Persico,* 832 F.2d 705, 713 (2d Cir.1987), *cert. denied,* 486 U.S. 1022, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988). These cases, and the argument Hodas makes, are derived from the criminal RICO context and are the same ones the First Circuit has already refused to apply to this type of case. *See Rodriguez,* 917 F.2d at 666–68.

For the foregoing reasons, the defendants' motion to dismiss is GRANTED.