# United States Court of Appeals
## For the First Circuit

No. 18-1051

VICTOR ÁLVAREZ-MAURÁS,

Plaintiff, Appellant,

v.

BANCO POPULAR OF PUERTO RICO; ALEXANDER GARCIA;
WANDA O. MELENDÉZ-SANTOS; CONJUGAL PARTNERSHIP GARCIA-MELÉNDEZ,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Bruce J. McGiverin, Magistrate Judge]

Before

Howard, Chief Judge,
Thompson and Kayatta, Circuit Judges.

Paul Vilaŕo Nelms, with whom Vilaŕo Law Offices was on brief,
for appellant.
Sara Vélez-Santiago and Néstor M. Méndez-Gómez, with whom
José A. Alvarado-Vázquez and Pietrantoni Mendez & Alvarez LLC were
on brief, for appellees.

March 25, 2019

**THOMPSON, Circuit Judge**.

Appellant Víctor Álvarez-Maurás ("Álvarez"), a building contractor from Carolina, Puerto Rico, claims that his securities broker, in collusion with the investment firm and affiliated bank, pilfered over $400,000 from his investment account, and then covered up the theft. His claims are brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962, 1964. The case reaches us on appeal after the district court dismissed all of Álvarez's claims against all defendants, on their Fed. R. Civ. P. 12 motion.

Álvarez's story begins way back in 1989 when Hurricane Hugo ravaged the island of Puerto Rico.[1] Responding to the destruction, the Federal Emergency Management Agency hired Álvarez to help in the rebuilding effort. Within a year, he had earned over $1 million, which he used to purchase a certificate of deposit from appellee Banco Popular of Puerto Rico, Inc. ("Banco Popular"). Several years later, thinking ahead to his retirement,[2] Álvarez approached appellee Alexander Garcia, a securities broker at Banco Popular's affiliate Popular Securities, Inc. ("Popular

---

[1] This background comes from Álvarez's 2012 arbitration claim. In a different filing with the Commonwealth Court of First Instance, Álvarez alternatively cites repair work following Hurricane Georges in 1998 as the source of his fortune. Different attorneys drafted these discrepant filings.

[2] Álvarez was born in 1943.

Securities").  Álvarez had two investment objectives:  he wanted to get a modest monthly income stream; and he wanted to retire in ten years' time, when he turned 65, and begin to draw down on the balance.  Sadly things did not go as Álvarez planned -- a third of his money disappeared without a trace, allegedly embezzled by his broker, Garcia.

### Background

When Álvarez[3] discovered that a chunk of his money was gone, he began a series of inquiries, of which more will be detailed hereafter.  Today, with the investigations complete and the benefit of hindsight, a devious and deceitful scheme seems to have emerged.  Given that this is a motion to dismiss, unless otherwise noted, we present the facts as set forth in Álvarez's verified complaint.

Back in 1998, on December 17, Álvarez met with Garcia at Popular Securities and opened two investment accounts, with an initial investment of $875,000.  Álvarez discussed his retirement plans with Garcia, instructing Garcia to select conservative securities which would safeguard his nest egg and allow for a modest monthly income stream.  On February 11, 1999, Álvarez met

---

[3] According to Puerto Rican naming conventions, if a person has two surnames, the first (the father's last name) is primary, and the second (the mother's maiden name) is subordinate.  In keeping with this, we will use "Álvarez" to identify our appellant.

with Garcia again and deposited an additional $125,000, bringing his total investment to $1 million.[4]

At this second meeting, Garcia instructed Álvarez to close his bank account at the Rio Piedras branch of Banco Popular, and to open a new account at the Barbosa branch. Suspecting nothing nefarious, Álvarez complied. Over the next several months, between April 1999 and January 2000, Garcia made four fraudulent transfers from Álvarez's investment accounts to the closed bank account at the Rio Piedras branch, without Álvarez's knowledge or consent. These four transfers totaled $419,632.43.[5]

With an eighth-grade education, no investment background, and no English language skills, Álvarez had trouble making heads or tails of his monthly brokerage account statements; however, he was concerned in the first year after investing when he noticed that the total value had gone down. When questioned about the reason for the dip, Garcia reassured him, explaining that market fluctuations would cause some ups and downs in the total value, but that the full $1 million would be there when Álvarez retired in 2009. Álvarez trusted Garcia and believed his

---

[4] In some documents, the total amount is identified as $1,075,000.

[5] $220,000.00 was transferred on April 20, 1999. $30,000.00 was transferred on November 2, 1999. $120,000.00 was transferred on December 28, 1999, and $49,632.43 was transferred on January 19, 2000.

- 4 -

explanation. And, in spite of the account statement irregularities, Álvarez was in fact receiving a monthly income, as he had requested.

In early 2009, when Álvarez was ready to retire, he met with Garcia and learned that there was only $600,000 in his investment accounts. Confronted once again about the fund balance, Garcia shifted his explanation for the shortfall, telling Álvarez that his initial investment had always been only $600,000. Concerned, Álvarez requested an internal investigation. On January 28, 2009, Popular Securities backed up Garcia's story that Álvarez's initial investment was only $600,000. Alarmed by this explanation, Álvarez requested a second investigation. This one took two years to wrap up; concluding, on February 11, 2011, as before, that Álvarez had only invested $600,000. After that, Álvarez wrote a letter of complaint to Banco Popular's CEO but received no response.

### *Arbitration*

Álvarez next sought arbitration, pursuant to the agreement he'd signed when he opened his accounts with Popular Securities. We don't have a copy of the arbitration agreement, but the district court quoted an excerpt, which it, in turn, lifted from the judgment of the Puerto Rico commonwealth court. No party has objected to the content of the text or the district court's reliance on it. It states:

> All controversies that may arise between the undersigned [Álvarez] and you, as introducing or clearing broker, your agents, or employees, concerning any transaction or the construction, performance, or breach of this or any other agreement between us, whether such transaction or agreement was entered in prior, on, or subsequent to the date hereof, shall be determined by arbitration . . . .

Accordingly, on January 19, 2012, Álvarez, through counsel, filed a claim for arbitration with the Financial Industry Regulatory Authority ("FINRA"). The claim covered the conduct of Garcia and Popular Securities only, because claims against Banco Popular "are not allowed to be filed at" FINRA, according to Álvarez; and, at any rate, the parties appear to concur that the arbitration agreement does not cover Banco Popular. Instead, the nineteen-page claim focuses almost exclusively on Garcia's unsuitable investment decisions in choosing vehicles that were too risky for Álvarez, given his age and investment goals. For example, the claim states [verbatim]:

> Respondents made an express guaranteed to Claimant of preservation of capital and monthly income return through out the life of the investment. Respondents knew or should have known that by investing Claimant retirement funds in the above mentioned were unsuitable recommendations, this in light of Claimant's age, life stage, risk tolerance and investment objectives which were conservative, preservation of capital and to receive monthly income.

The claim also alleges that Popular Securities failed to sufficiently supervise Garcia's work. In one paragraph, Álvarez

- 6 -

references the prior internal investigation "that erroneously concluded that the initial amount invested was $600,000, rather than $1,075,000, as of today there are $475,000 that still unaccounted for." [sic]

During the course of the arbitration proceeding, FINRA requested that Álvarez produce bank statements to demonstrate the amount of his initial investment. He was unable to locate these records. The record is silent as to what documents, if any, FINRA requested from Popular Securities. Popular Securities' initial response to Álvarez's claim attributed his losses to "the impact of the financial crises at the world level in the securities markets." However, during the proceedings, Popular Securities took the opportunity to switch its cover-story yet again. Moving on from its and Garcia's fabrications concerning the fluctuating vagaries of the stock market and its subsequent assertions that Álvarez only deposited $600,000, at the arbitration hearing, Popular Securities came up with a new version: producing three transfer documents, ostensibly showing that Álvarez had actually authorized three out of four of Garcia's transfers to the (closed) Rio Piedras bank account. There was no paperwork for the final transfer of $49,632.43, which took place on January 19, 2000; nor were there any bank statements, cancelled checks, microfilm, computer records, or other internal bank or brokerage firm documents reflecting any of the transfers.

After being shown these putative transfer notices, Álvarez hired a qualified forensic document examiner to peruse the authorizations. The examiner submitted his completed report to FINRA on February 20, 2013, and testified before the panel on March 12, 2013. He concluded that the authorizations were prepared by Garcia in his own handwriting, and that Álvarez's signatures at the bottom were actually forgeries. These conclusions were not contested or contradicted by Garcia or Popular Securities; in fact, Garcia even admitted the handwriting was his.

Notwithstanding these revelations, FINRA issued its award on April 1, 2013, dismissing Álvarez's claims with prejudice for failing to make out a *prima facie* case. In its ruling, FINRA provided no explanation for its decision. At the same time, the panel ordered Popular Securities to pay all the arbitration fees ($16,750), and disallowed its request for $70,000 in attorneys' fees. Álvarez's filing fee of $1,425.00 was refunded to him. In addition, FINRA denied Popular Securities' request to expunge the complaint from Garcia's record.

### Commonwealth courts

As Álvarez explains in his complaint, "[d]ue to the inconsistent and contradictory 'Award' issued by FINRA," he determined to pursue his claims with the Court of First Instance of the Commonwealth of Puerto Rico, filing a complaint on May 15, 2013, which sought to vacate the FINRA award. On May 8, 2014, on

Popular Securities' motion to dismiss, the court, in deference to FINRA, confirmed the award. In accordance with Puerto Rico law concerning arbitration awards,[6] the court performed an extremely limited review. Álvarez then appealed the decision to the Commonwealth's Appeals Court on August 11, 2014. Again, FINRA's award was confirmed. The appeal was denied again, on Álvarez's motion for reconsideration, on December 8, 2014. *Certiorari* was denied by the Supreme Court of Puerto Rico, which also issued denials of two further reconsideration motions. Álvarez received his final rejection from the Commonwealth courts on October 23, 2015, concluding this fruitless avenue of litigation.

### *District court litigation*

A year later, on October 20, 2016, Álvarez filed his federal RICO claims against Garcia[7] and Banco Popular. Álvarez

---

[6] In its judgment, the Court of First Instance explained that the Supreme Court of Puerto Rico has urged great deference to arbitration awards:

> [T]he arbitrator's appraisal of the facts is not reviewable, nor are errors presented which involve the consideration on the merits of matters of fact regarding evidence received by arbitrators. In addition, the mere erroneous appraisal of the evidence is not grounds for reviewing an arbitration award. Moreover, an award cannot be annulled merely for errors in judgment, whether in regards to the law or in regards to the facts.

(internal citation omitted).

[7] Álvarez also names as defendants Garcia's wife, Wanda O. Meléndez-Santos, and their "conjugal partnership." The Supreme

claims that Garcia made the fraudulent transfers out of his investment accounts, wrongfully forging Álvarez's signature; and that the compliance department of Popular Securities, which he alleges was "under the control and authority" of Banco Popular, conducted two fraudulent investigations with "the sole purpose of misleading Plaintiff into believing that he had only initially deposited about $600,000." As Álvarez alleges, it was not until February 20, 2013, when he saw the report from the forensic examiner that he "learned Garcia had forged Plaintiff's name on the transfers." The civil RICO statute, pursuant to which Álvarez presses his claims, has a four-year statute of limitations. Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143, 156 (1987).

Garcia and Banco Popular moved to dismiss the complaint based on a variety of grounds. The district court focused on two of those arguments which it found dispositive: 1) that the claims against Garcia must be dismissed, pursuant to Fed. R. Civ. P. 12(b)(1) (lack of subject matter jurisdiction), because those claims are subject to the arbitration agreement; and 2) that the claims against Banco Popular must be dismissed, pursuant to Fed. R. Civ. P. 12(b)(6) (failure to state a claim upon which relief

Court of Puerto Rico has interpreted certain sections of its civil code to create liability against a conjugal partnership for debts incurred by one spouse, in some situations. See Cruz Viera v. Registrador, 18 P.R. Offic. Trans. 1046, 1051-53 (1987).

- 10 -

can be granted), because those claims are barred by RICO's statute of limitations. The court embraced defendants' reasoning on these arguments and granted the motion, dismissing all claims against all defendants.

This brings us up to the present.

## Analysis

On appeal, Álvarez advances two principal arguments relative to his RICO claims: first, he asserts that the arbitration provision of his brokerage-account agreement should not bar his RICO claims; and second, he challenges the district court determination that the statute of limitation bars his RICO claims. We take each argument in turn.

We review the court's decision *de novo*, focusing on the complaint and treating all well-pled facts therein as true. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007); Vartanian v. Monsanto Co., 14 F.3d 697, 700 (1st Cir. 1994). However, beyond the allegations in the complaint, the court may consider certain additional documents "the authenticity of which are not disputed by the parties," making narrow exceptions to the general rule "for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993); see also Boateng v. InterAmerican Univ., Inc., 210 F.3d 56, 60 (1st Cir. 2000) (stating that documents from prior state adjudications are

"ordinarily" treated as public records).  In this instance, in order to fully understand the circumstances, we have reviewed (as did the district court) undisputed and public documents from Álvarez's arbitration proceeding, including his claim and the award, as well as court memoranda and orders from earlier proceedings.  After hearing oral argument and undertaking a thorough review of the record and the parties' submissions, we affirm the district court's opinion and order.

### *Claims against Garcia -- the arbitration agreement*[8]

Before us Álvarez reprises his district court argument that his RICO claims are distinct from the claims litigated through

---

[8] As a threshold matter we note appellees have styled their motion to dismiss Álvarez's claims against Garcia as a motion to dismiss for lack of subject matter jurisdiction, under Fed. R. Civ. P. 12(b)(1), which the district court granted.  Yet this circuit has consistently held that the existence of a valid arbitration agreement does not strip the court of jurisdiction. Skirchak v. Dynamics Research Corp., 508 F.3d 49, 56 (1st Cir. 2007) (citing DiMercurio v. Sphere Drake Ins., PLC, 202 F.3d 71, 77 (1st Cir. 2000)).  Regardless, there is a split in authority as to whether claims such as appellees' must be brought pursuant to Rule 12's section (b)(1) or section (b)(6), that is, for failure to state a claim on which relief may be granted; or perhaps considered with an analysis "entirely separate from the Rule 12(b) rubric."  Cortés-Ramos v. Sony Corp. of Am., 836 F.3d 128, 130 (1st Cir. 2016) (quoting Cont'l Cas. Co. v. Am. Nat'l Ins. Co., 417 F.3d 727, 732 (7th Cir. 2005)).  In instances where the district court's ruling rests on evidentiary findings, this distinction may be important to our standard of review.  See Valentin v. Hosp. Bella Vista, 254 F.3d 358, 362-65 (1st Cir. 2001) (holding that an appeal of a Rule 12(b)(1) ruling that resolves a factual challenge must be reviewed with a deferential "clearly-erroneous" standard).  Here, where there is no factual dispute, it is a distinction without a difference and our review is *de novo*.

arbitration; specifically he says he is not trying to appeal the arbitration award, but instead he wants to assert his rights under the civil RICO statute on an entirely new batch of claims and to vindicate those federal statutory rights in a federal forum. As Álvarez argues, because RICO "confers jurisdiction on federal district courts, 18 U.S.C. § 1964(c), this subject action is not precluded by a previous arbitration award when no issue preclusion or claim preclusion applies." Nor, as he adds, does this court lack subject matter jurisdiction to hear his claims.

Countering, appellees maintain here, as they did below, that Álvarez's claims against Garcia have already been adjudicated through arbitration, and that, in any case, the present claims, if not completely barred, are subject to the parties' arbitration agreement.

The question of arbitrability -- that is, whether or not the parties have agreed to submit a dispute to arbitration -- is "an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002) (quoting AT&T Techs., Inc. v. Communications Workers of Am., 475 U.S. 643, 649 (1986)). One seeking to enforce an arbitration agreement "must show that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's

- 13 -

scope." InterGen N.V. v. Grina, 344 F.3d 134, 142 (1st Cir. 2003). Here, there is no dispute that a valid arbitration agreement was part of the brokerage contract Álvarez consummated with Popular Securities back in 1999. And that provision is broad; it covers all controversies between the parties, including Garcia's agents or employees, "concerning any transaction or the construction, performance, or breach of this or any other agreement between us . . . ." Therefore, by its clear terms, Álvarez's RICO claims, even though substantively different from the earlier claims submitted to FINRA arbitration, fall within the expansive ambit of this arbitration provision, meaning his assertions that his statutory RICO claims may be pursued outside the arbitration framework simply don't hold up. See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985) ("By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.").[9]

So, we conclude, as did the district court, that the federal claims against Garcia in this forum must be dismissed

---

[9] Adding strength to appellees' side of the ledger is a strong federal policy favoring arbitration; "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Mitsubishi, 473 U.S. at 626 (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983)); see also KKW Enterprises, Inc. v. Gloria Jean's Gourmet Coffees Franchising Corp., 184 F.3d 43, 49 (1st Cir. 1999).

- 14 -

without prejudice to Álvarez pursuing them in arbitration, if that avenue remains available. See Cortés-Ramos, 836 F.3d at 130 ("[I]n light of the District Court's order compelling arbitration, Cortés's claims have not been extinguished but have been merely left to the arbitrator" (internal alterations and quotations omitted)). Further, as the district court correctly held, because Álvarez's claims against Garcia's wife and the couple's conjugal partnership are derivative of the claims against Garcia, those claims are dismissed as well. See e.g., González-Álvarez v. Rivero-Cubano, 426 F.3d 422, 429 n.7 (1st Cir. 2005).

### Claims against Banco Popular -- RICO claims

Banco Popular was not a party to the arbitration agreement binding Álvarez, Garcia and Popular Securities.[10] Consequently, that agreement imposes no bar to Álvarez's claims against Banco Popular.[11] Nonetheless, we are confronted with the timeliness of Álvarez's filing. On the issue of RICO's four-year

---

[10] Álvarez makes a third argument on appeal. One of appellees' grounds for their motion to dismiss was that Álvarez's failure to join Popular Securities as a defendant mandated dismissal of his complaint under Fed. R. Civ. P. 12(b)(7), for failure to join a necessary party under Rule 19. Álvarez responded to this argument in an addendum filed with the district court, and he rehashes the same argument in his appellate brief. Because we affirm the district court's ruling on other grounds, we do not address this argument.

[11] That is, at least, absent circumstances not present here. See Next Step Med. Co., Inc. v. Johnson & Johnson Int'l, 619 F.3d 67, 71-72 (1st Cir. 2010).

statute of limitations, Álvarez disputes the district court's assessment that he knew or should have known about his injury no later than January 19, 2012, when he filed his FINRA claim. Instead, he argues that his claims are not time barred because he did not know of his injury until February 20, 2013, when his forensic examiner revealed Garcia's forgery.[12]  Additionally, Álvarez also contends that up to that point, despite his diligent efforts to get to the bottom of what happened to his money, he was kept in the dark, thanks to Garcia's various lies and misrepresentations.  His final point on this particular issue is that the determination of when he learned of his injury should not be decided at the motion-to-dismiss juncture, but, rather, is a matter to be decided by a jury.  After considering afresh Álvarez's arguments, we conclude, like the district court, that these claims are precluded by RICO's four-year statute of limitations.  We explain.

The Racketeer Influenced and Corrupt Organizations Act provides not only for criminal penalties, but also for civil remedies for plaintiffs who can prove an injury caused by a pattern of racketeering activity by an enterprise.  18 U.S.C. §§ 1962, 1964; Home Orthopedics Corp. v. Rodríguez, 781 F.3d 521, 528 (1st Cir. 2015).  RICO itself does not specify a statute of limitations.

_____

[12] This lawsuit was filed October 20, 2016 -- within four years of Álvarez's proposed start-the-clock date.

- 16 -

However, in 1987, the Supreme Court stepped in "to resolve the important question of the appropriate statute of limitations for civil enforcement actions brought under RICO," importing therein the four-year deadline found in the civil enforcement provision of the Clayton Act, which regulates anti-competitive business practices in the marketplace. Malley-Duff, 483 U.S. at 146, 156; 15 U.S.C. § 15b.

Since the Malley-Duff ruling, much of the debate over RICO time limits has centered on the identification of the event that triggers the running of the statute. The Supreme Court has again shed light on the dispute. First, in Klehr v. A. O. Smith Corp., the Court rejected the "last predicate act rule," which pegged the start of the four-year clock to the last act of racketeering, restarting the clock whenever a new episode of racketeering took place. 521 U.S. 179, 187 (1997). Then, in Rotella v. Wood, the Court considered another theory that had gained some traction around the country: the "injury and pattern discovery rule," which started the running of the statute when "the claimant discovers, or should discover, both an injury and a pattern of RICO activity." 528 U.S. 549, 553-56 (2000). The Rotella Court flat out rejected a limitation rule tied in any way to the discovery of a pattern of racketeering:

> By tying the start of the limitations period
> to a plaintiff's reasonable discovery of a
> pattern rather than to the point of injury or

> its reasonable discovery, the rule would
> extend the potential limitations period for
> most civil RICO cases well beyond the time
> when a plaintiff's cause of action is complete
> . . . .

Id. at 558.  Instead the court once again trained its sights on the Clayton Act and determined the "injury discovery accrual rule" (the details of which we'll flesh out in a moment) to be the best starting point. Id. at 553-54.[13]

Some seven years before the Supreme Court decided Rotella, we had already noted our adoption of the injury discovery accrual rule for civil RICO violations.  In Rodriguez v. Banco Central, we concluded that the RICO statute of limitations begins to run "when a plaintiff knew or should have known of his injury." 917 F.2d 664, 666 (1st Cir. 1990).  This means "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." Lares Group, II v. Tobin, 221 F.3d 41, 44 (1st Cir. 2000) (quoting Rotella, 528 U.S. at 555).  As the district court astutely reasoned in its first-tier scrutiny of the Lares Group's claims: "In this circuit, the meter begins to tick when the plaintiff discovers the injury, even if the plaintiff is unaware of the precise acts of racketeering that caused the injury." Lares Group, II v. Tobin, 47 F. Supp. 2d 223, 230 (D.R.I.

---

[13] The Court left the door open to the adoption of "the 'injury occurrence' rule, under which discovery [of the injury] would be irrelevant."  Rotella, 528 U.S. at 554 n.2.

1999), aff'd, 221 F.3d 41 (2000).  Post Lares Group, in the analogous context of securities fraud, we elaborated about the moment the claimant should know of his or her injury: in Young v. Lepone, we talked about "storm warnings" that would put a reasonable investor on "inquiry notice" that fraud may have occurred. 305 F.3d 1, 8 (1st Cir. 2002).  As we explained:

> The first step in the pavane requires a reviewing court to ascertain whether, when, and to what extent, storm warnings actually existed in a given situation.  Because sufficient storm warnings would lead a reasonable investor to check carefully into the possibility of fraud, this step necessarily entails a determination as to whether a harbinger, or series of harbingers, should have alerted a similarly situated investor that fraud was in the wind.

Id.

The "known or should have known" analysis includes both subjective and objective components.  In the context of securities fraud, we wrote:  "We have recently emphasized, moreover, that whether a plaintiff should have discovered the fraud is an objective question requiring the court to determine if the plaintiff possessed such knowledge as would alert a reasonable investor to the possibility of fraud." Maggio v. Gerard Freezer & Ice Co., 824 F.2d 123, 128 (1st Cir. 1987) (internal quotations omitted).

That being said, there is an equitable principle, as Álvarez points out, that sometimes works to extend the four-year

clock. According to the doctrine of fraudulent concealment, the statute of limitations may be temporarily tolled during such time that the perpetrator purposefully and successfully conceals his or her misconduct from its victim. Berkson v. Del Monte Corp., 743 F.2d 53, 55 (1st Cir. 1984). Again in the context of the Clayton Act, we have held that the doctrine of fraudulent concealment may be invoked when a claimant can establish three elements: 1) wrongful concealment by defendants of their actions; and 2) failure of the claimant to discover, within the limitations period, the operative facts which form the basis of the cause of action; 3) despite the claimant's diligent efforts to discover the facts. Id. The doctrine has since been applied to RICO claims as well. See, e.g., Harry v. Countrywide Home Loans, Inc., 902 F.3d 16, 18-19 (1st Cir. 2018); Lares Group, 47 F. Supp. 2d at 231; Hodas v. Sherburne, Powers & Needham, 938 F. Supp. 60, 63 (D. Mass. 1996), aff'd, 114 F.3d 1169 (1st Cir. 1997); see also Banco Central, 917 F.2d at 668 (explaining that the court could "easily imagine" the doctrine of fraudulent concealment being applied in RICO cases).

Keeping in mind these notions about a claimant's discovery of his injury and a malfeasor's efforts to conceal his misdeeds, we turn now to the specifics of the case before us.

Álvarez asserts that his injury did not accrue until he learned of Garcia's forgeries from the forensic document examiner in February 2013. Misinterpreting (our characterization) certain

language in Rotella, he argues that the actual moment that triggers the running of the statute is the point at which he knows "that he has been hurt and who has inflicted the injury." Rotella, 528 U.S. at 556. And, Álvarez goes on, because he did not know of his injury until February 2013, he need not rely on the doctrine of fraudulent concealment to toll the statute of limitations because his injury accrual date falls within the four-year statutory time frame.

Alternatively, Álvarez argues that Garcia did engage in fraudulent concealment, successfully preventing Álvarez from suspecting that his money had been stolen until February 2013. To demonstrate his state of mind during this time, Álvarez points to his arbitration complaint, filed with FINRA in January 2012, in which he claimed only that Garcia chose unsuitably risky investments for him. While he had been told by Garcia and Popular Securities that some of his original investment was "unaccounted for," this was a far cry from knowing that he had been robbed of $419,632.43. Until Álvarez got the report from the forensic examiner, he thought that maybe there was some kind of accounting error. And he adds, defendants continue to conceal their fraud to this day.

According to Álvarez's characterization of the timeline, first Garcia lied about the market fluctuations, then Popular Securities ("with the knowledge of the CEO and Board Chairman of

the Defendant Bank") undertook two "fraudulent investigations," which "misled and obfuscated the matter by only focusing on minor losses associated with the investment activities of $600,000." Álvarez reiterates that "as a completely unsophisticated investor," he had no knowledge that he had been defrauded until after he filed the FINRA claim and the facts came to light. In support of his argument, Álvarez cites to a district court case from this circuit that he says holds that a mere denial of wrongdoing may be sufficient to establish fraudulent concealment, if the plaintiff cannot, or does not, discover the fraud with reasonable diligence, In re Atlantic. Fin. Mgmt., Inc. Securities Litigation, 718 F. Supp. 1003, 1011 (D. Mass. 1988).

For their part, appellees maintain that Álvarez knew of his "monetary losses" in January 2009, when he met with Garcia to discuss his imminent retirement and learned that his account held only $600K. At the very latest, after Popular Securities concluded its second internal investigation in February 2011, Álvarez demonstrated that he knew of his injury when he wrote a letter to Banco Popular's CEO, which according to Álvarez's complaint was admittedly "about the embezzlement activities." As for fraudulent concealment, appellees concede that Garcia's misrepresentations prior to 2009 may have operated to conceal Garcia's actions. But, in 2009, when Garcia told him that his investment was only $600K, Álvarez knew or should have known about his alleged injury.

Regrettably for Álvarez we think Garcia and Banco Popular have the better arguments. Our *de novo* review leads us to conclude Álvarez knew of his injury, at the very latest, by the time he filed his claim with FINRA in January 2012. Indeed, it is because of his injury that he filed the FINRA claim.[14] Although he did not know the criminal methods Garcia had employed in order to steal his money, Álvarez knew that his funds had disappeared.

Álvarez's reliance on certain language from Rotella -- that the injury accrues when the claimant knows "that he has been hurt and who has inflicted the injury" -- is misplaced. 528 U.S. at 556. The phrase cited from Rotella is itself lifted from United States v. Kubrick, 444 U.S. 111, 122 (1979), a medical malpractice case. And, the implication that the claimant must know specifics about who inflicted the injury is a misreading of Rotella's core holding (and is inconsistent with First Circuit RICO precedent). For example, immediately before the Rotella Court quotes from Kubrick, it writes, ". . . in applying a discovery accrual rule, we have been at pains to explain that discovery of the injury, not discovery of the other elements of a claim, is what starts the

---

[14] Arguably Álvarez knew of his injury even earlier, but we are willing to allow that Garcia, through his misrepresentations, and Popular Securities, through its sorry and deficient internal investigations, successfully concealed the injury from Álvarez until the second investigation concluded in February 2011.

clock." Rotella, 528 U.S. at 555. Citing this very sentence, we wrote in Lares Group, "We . . . believe that this passage is instructive and accurately reflects the law of this Circuit." Lares Group, 221 F.3d at 44.

Similarly unpersuasive is Álvarez's reference to Atlantic Fin. Mgmt. for the proposition that a perpetrator's denial of wrongdoing, even without additional affirmative acts, may be sufficient to establish fraudulent concealment. 718 F. Supp. at 1010-11. Be that as it may, what is determinative in Álvarez's case is that, despite Garcia's stonewalling, there were enough warning signs to put Álvarez, or a reasonable investor in his situation, on notice that something was seriously amiss, that is, "[w]hen telltale warning signs augur that fraud is afoot, . . . such signs, if sufficiently portentous, may as a matter of law be deemed to alert a reasonable investor to the possibility of fraudulent conduct." Young, 305 F.3d at 8.

In light of the "telltale warning signs," we find that Álvarez knew or should have known of his injury no later than January 2012, making his October 2016 RICO complaint out of time.

### *Jury question*

Lastly, Álvarez argues that the issue of when he knew or should have known of his injury is a question that must be resolved "at a later point by the trier of fact," and that his claims may not be dismissed without providing an opportunity for a factfinder

- 24 -

to weigh the evidence. Continuing on, he argues further that a defendant may only raise the statute of limitations as a defense, and the court may only grant a motion to dismiss, "when the facts that give rise to the defense are clear from the face of the complaint." Appellees point to LaChapelle v. Berkshire Life Ins. Co., which stated that "[g]ranting a motion to dismiss based on a limitations defense is entirely appropriate when the pleader's allegations leave no doubt that an asserted claim is time-barred." 142 F.3d 507, 509 (1st Cir. 1998) (breach of contract).

Indeed, as Álvarez argues, often the issues of what a claimant knew and when he knew it are determined by a jury or other factfinder. See, e.g., Young, 305 F.3d at 9; Santiago Hodge v. Parke Davis & Co., 909 F.2d 628, 633 (1st Cir. 1990). However, it is well settled in this circuit that a motion to dismiss may be granted on the basis of an affirmative defense, such as the statute of limitations, as long as "the facts establishing the defense [are] clear 'on the face of the plaintiff's pleadings.'" Blackstone Realty LLC v. FDIC, 244 F.3d 193, 197 (1st Cir. 2001) (quoting Aldahonda-Rivera v. Parke Davis & Co., 882 F.2d 590, 592 (1st Cir. 1989)); see also LaChapelle, 142 F.3d at 509.

As the district court noted, "the facts are unassailable." We agree. The facts, as presented in Álvarez's complaint, clearly establish that he knew, or should have known, of his injury more than four years before he filed his RICO claims.

Consequently, the RICO claims against Banco Popular must be dismissed.

The outcome of this case no doubt seems harsh. As described in his complaint, Mr. Álvarez's situation is unfortunate: he apparently was victimized by someone he trusted to act in his best interests. Nevertheless, four years is a relatively lengthy statute of limitations; and a claimant's ability to reach back in time to address past grievances must have some boundaries. The Supreme Court has often cited the "basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." Rotella, 528 U.S. at 555; see also Gabelli v. SEC, 568 U.S. 442, 448 (2013) ("Statutes of limitations are intended to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. They provide security and stability to human affairs." (internal quotations and citations omitted)). The actions that form the basis of the present complaint started in 1999; that is a long time ago indeed.

## Conclusion

We hold that the claims brought by Victor Álvarez-Maurás against appellee Alexander Garcia may only be resolved through arbitration, subject to the binding agreement between the parties.

Because the claims against Alexander Garcia's wife, Wanda O. Meléndez-Santos, and the couple's conjugal partnership are derivative of the claims against Garcia, those claims are also subject to the arbitration agreement. Álvarez's claims against appellee Banco Popular of Puerto Rico are out of time, pursuant to 18 U.S.C. § 1964. Consequently, we affirm the district court's ruling, dismissing all claims against all defendants.

Costs to appellees.